649 A.2d 336

**STATE of Maryland**

v.

**Christopher J. ALBRECHT.**

**No. 152, Sept. Term, 1993.**

Court of Appeals of Maryland.

Oct. 21, 1994.

Reconsideration Denied Dec. 5, 1994.

476

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Tarra DeShields–Minnis, Asst. Atty. Gen., all on brief), Baltimore, for petitioner.

Byron L. Warnken, Warnken & Warnken, Baltimore (Gary L. Crawford, Clarke, Crawford, & Bonifant, Gaithersburg, Roger W. Galvin, Rockville, all on brief), for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RAKER, Judge.

Petitioner Christopher J. Albrecht was found guilty of one count of involuntary manslaughter and two counts of reckless endangerment following a bench trial before Judge Peter J. Messitte in the Circuit Court for Montgomery County. Al-

brecht appealed, contending that the evidence presented to the trial court was legally insufficient to sustain those convictions. The Court of Special Appeals agreed with Albrecht's contention and reversed. *Albrecht v. State*, 97 Md.App. 630, 632 A.2d 163 (1993). We granted the State's petition for a writ of certiorari to review the judgment of the intermediate appellate court. Upon our review of the record evidence, we conclude that sufficient evidence was presented at trial to support each of Albrecht's convictions. Accordingly, we shall reverse the judgment of the Court of Special Appeals.

## I.

At the outset, we emphasize that when an appellate court is called upon to determine whether sufficient evidence exists to sustain a criminal conviction, it is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case. Rather, we review the evidence in the light most favorable to the State, *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Branch v. State*, 305 Md. 177, 182–83, 502 A.2d 496, 498 (1986), giving due regard to the trial court's finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses. *See, e.g., State v. Raines*, 326 Md. 582, 589, 606 A.2d 265, 268 (1992); Maryland Rule 8–131(c).[1] Fundamentally, our concern is not with whether the trial court's verdict is in accord with what appears to us to be the weight of the evidence, *see Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573; *Allison v. State*, 203 Md. 1,

---

1. Maryland Rule 8–131 provides, in pertinent part:

    *(c) Action Tried Without a Jury.*—When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

5, 98 A.2d 273, 275 (1953), but rather is only with whether the verdicts were supported with sufficient evidence—that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt.

In other words, when a sufficiency challenge is made, the reviewing court is not to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt"; rather, the duty of the appellate court is only to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 (emphasis in original); *see also Oken v. State,* 327 Md. 628, 661, 612 A.2d 258, 274 (1992); *Raines,* 326 Md. at 588–89, 606 A.2d at 268.

## II.

The basic facts of this case are undisputed. On the afternoon of May 23, 1991, Montgomery County Police Officers Christopher Albrecht and Marvin Thomas were dispatched to Fairhaven Drive in Gaithersburg, Maryland, to investigate a reported stabbing. Upon arriving at the scene, the officers were informed that a fight had broken out between Timothy Fair and three young men and that Fair had been stabbed in the back with a broken bottle by Darnell Budd, whom Albrecht knew by name. Witnesses at the scene also told the officers that the three men involved in the fight were known to be drug dealers and that the three might have been involved in a robbery. The officers were told that Budd had left the Fairhaven Drive area in a green Chevrolet driven by Rebecca Garnett. One witness warned the officers that there might be a gun in the Chevrolet, although no one at the scene reported seeing any of the individuals involved with a gun.

While the officers were still at the scene, a witness saw the green Chevrolet pass by and shouted "There goes the car."

Albrecht saw three people in the car as it passed: a female, who was driving, and two black male passengers. Thomas and Albrecht both got into their cruisers and set off in pursuit. Although the officers initially lost sight of the Chevrolet, after a brief search of the surrounding neighborhood Albrecht spotted the car in a parking lot at Larchmont Terrace, a townhouse complex in Montgomery County. The car was parked perpendicular to the curb with the front end facing the street. The driver, Rebecca Garnett, and one of the male passengers, whom Albrecht recognized as Darnell Budd, had exited the car and were standing in the parking lot. The other male passenger, James Littlejohn, remained in the back seat of the car. The car was parked directly in front of a neighborhood playground. The documentary evidence presented at trial showed that Garnett stood no more than six feet from the sidewalk that ran in front of the playground area. In photographs from the scene, some playground equipment, including a slide, is visible directly behind the spot where Rebecca Garnett stood. A swingset is visible to the rear and the right of where Garnett stood. Both the slide and swingset appear to be set approximately ten to fifteen feet behind the sidewalk. At the time that Albrecht spotted the Chevrolet—which was approximately 7 p.m.—it was still daylight and there were several children and adults both in the playground area, on the sidewalk running behind the Chevrolet and in front of the playground, and on the surrounding street.

Albrecht brought his police cruiser to a stop in front of and to the right of the driver's door of the Chevrolet. At that time, Garnett was standing next to the closed driver's side door, holding a bag of Fritos in one hand. Her other hand was empty. Budd stood by the passenger side door. Littlejohn, still in the car, appeared to be either sitting on the back seat or kneeling down on the floorboards of the car's rear passenger compartment. As Albrecht was parking his cruiser, he saw Garnett and Budd exchange words and begin to move towards the Chevrolet, appearing to him as if they were going to try to leave the scene. Exiting his cruiser, Albrecht

yelled, "Stop! Freeze!" and, at the same time, removed his shotgun from its rack inside his vehicle. Witnesses at the scene reported also hearing a command to "Put your hands in the air." Albrecht, standing behind the open door of his cruiser, then immediately placed a shotgun shell in the chamber of the shotgun and "racked" [2] the shotgun into its final stage of firing capability. He then leveled his shotgun at Garnett, who stood approximately thirty-seven feet away from him. Witnesses at the scene testified that Albrecht, looking down the barrel of the gun, aimed his shotgun directly at Garnett.

Officer Thomas arrived at Larchmont Terrace a matter of seconds after Albrecht. Thomas moved his police cruiser into a position in front of and to the left of the Chevrolet. The manner in which Albrecht and Thomas parked their cruisers was in accordance with standard police procedure by which officers use their vehicles for cover while attempting to effectuate an arrest. When Thomas first exited his cruiser, he did not remove his shotgun from its rack inside his vehicle. Upon hearing the racking of Albrecht's shotgun, however, Thomas reached back into his cruiser and removed his own. Both Thomas and Albrecht were using Remington Wingmaster Model 870 shotguns, the standard model shotgun issued to Montgomery County police officers. As manufactured, the shotgun holds four rounds of ammunition. Albrecht, however, had customized his weapon by fitting it with a bandolier, or sling, that held fifteen extra rounds of ammunition and added 2.39 pounds to the weight of his weapon.

Albrecht testified that he kept his shotgun pointed at Garnett until he decided that she did not pose any danger to him or to any other person. After "checking off" Garnett as a threat, Albrecht testified that he intended to swing the shotgun to the left in order to bring it to bear on Littlejohn and

---

**2.** At trial, it was explained that a Remington Wingmaster 870 is a "pump-action" shotgun. With pump-action shotguns, the user must manually load a live round of ammunition into the chamber area of the barrel. The term "racking" refers to the manual chambering of a round into the shotgun's barrel.

Budd. The shotgun, however, discharged and struck Garnett in the chest. Garnett died almost immediately. Witnesses at the scene testified that Albrecht was steadily holding the shotgun and directly aiming it at Garnett at the time that the weapon discharged.

Although Albrecht saw Garnett sink to the ground after his gun had fired, he testified that he thought that she was simply sitting down so as to comply with his orders to "stop" and "freeze" and that he did not realize that she had been shot. Shouting "I told you not to move," Albrecht immediately racked a second round into the shotgun's chamber as a result, Albrecht testified, of "realizing my gun went off." He and Thomas then approached the Chevrolet and placed Budd and Littlejohn under arrest. After Budd and Littlejohn had been arrested, Albrecht turned his attention to Garnett. Several witnesses at the scene testified that approximately ten minutes had elapsed since the shotgun had discharged before Albrecht approached Garnett. Witnesses at the scene also testified that Albrecht first "frisked" Garnett, patting down her pockets in an apparent search, before he attempted, without success, to administer CPR. On July 30, 1991, Albrecht was indicted in the Circuit Court for Montgomery County on one count of manslaughter, one count of recklessly endangering Rebecca Garnett, and one count of recklessly endangering various other individuals who were in the playground area of Larchmont Terrace at the time of the shooting.[3] A bench trial commenced on March 9, 1992, in the Circuit Court for Montgomery County before Judge Peter J. Messitte.

---

3. The third count of the indictment charged Albrecht with recklessly endangering the lives of seven individuals: Officer Marvin Thomas, Darnel Budd, James Littlejohn, Iris Frazier, Carroll Walker, Travell Dumar, and Tequila Frazier. Carroll Walker and Iris Frazier, both adults, were standing on the sidewalk which abutted the playground area when the shooting occurred. Travell Dumar, age 4, was playing in the playground prior to the shooting. After the shotgun discharged, Travell Dumar ran into the street, directly into the firing zone. Tequila Frazier, age 3, was riding her tricycle on the sidewalk behind the Chevrolet at the time of the shooting.

After all evidence had been received, Judge Messitte commented at length on the evidence presented and the elements of the crimes charged. With respect to the charge of voluntary manslaughter, Judge Messitte stated:

There has been a welter of evidence in this case, and there is no need to recount it all. One fact is clear beyond dispute—the Defendant fired a shot that caused the death of Rebecca Garnett. Was it an intended or unintended act? At a minimum, in order for the State to proceed with the charge of voluntary manslaughter, the State would have to convince that the act was intended, and I may say that as to the matter of voluntariness, I have sufficient doubt that I cannot find the Defendant guilty of voluntary manslaughter and I do not.

Having found non-proof of voluntariness, the trial court then turned to the charges of involuntary manslaughter and reckless endangerment:

The question in this case, the overriding question in this case, both in terms of the manslaughter and reckless endangerment charges, is whether the conduct overall of the Defendant was reckless, and I will assume that the same measure of recklessness, that it be a gross and wanton deviation from reasonable conduct, would apply to both the manslaughter and the reckless endangerment charges, although we did not discuss that I will assume that they are equivalent.

The trial court continued:

We are thus brought to the inquiry whether, under all the circumstances, Christopher Albrecht, conscious of the risk, acted in a grossly negligent manner, creating a high degree of risk to human life in the one case resulting in death and in the other resulting in endangerment.

I have no doubt that Christopher Albrecht was attempting to do right on the occasion in question and that he acted at all times without malice in his heart. But again, the standard is one of a reasonable officer similarly situated.

Much has been said about the high crime incidence in the Larchmont Terrace vicinity and the excited reports of people on the playground where the bottle stabbing occurred. Much has been said about the use of a shotgun in the course of police work; that it is an awesome weapon, effective often by its appearance alone, more so, of course, when actually put to use.

I will not recite all the facts that bring me to my conclusion, but I have thought much about it over the last two weeks and reach it with great pain and compassion for everyone involved.

It comes then to this. In my view, Christopher Albrecht, on the evening in question, particularly given the numerous innocent persons perceived and unperceived, including Rebecca Garnett, misjudged the situation before him very badly. He relied upon a weapon customized by him in a highly questionable and potentially dangerous fashion. Heedless of a situation where innocent bystanders stood at great risk of serious injury or death, he sought to capture a felon, not the most fiercesome type it must be said, by causing the innocent loss of life of Rebecca Garnett and by imperiling the lives of James Littlejohn, Tequila Frazier, Travell Dumar and Carroll Walker. He did not need to do so, given the relative lack of severity of the crime, given the lack of threats posed by the suspects, given their essential compliance with his shouted commands, particularly within the brief window of time between the time he gave the commands and the time he fired, and perhaps additionally, given the fact that he knew personally, as well as by name, the prime suspect and could take him down, as the police say, in good time without endangering the members of the community.

It is my belief that the Defendant's shotgun was aimed at Becky Garnett, as well as the others in the immediate vicinity of the green automobile, that Ms. Garnett's confused reaction to Defendant's commands startled him into pulling the trigger. He, I know, would wish it differently. But it

was his own unfortunate misguided act that put him in the way of that happening.

Regrettably, I conclude that Christopher Albrecht's conduct was not that of a reasonable officer similarly situated. It was conduct that was not only negligent, but grossly so.

Ultimately, it rises in my view to the level of negligence sufficient to convict the Defendant of involuntary manslaughter, and I find him guilty of that count.

He is also guilty of the charge of reckless endangerment against Rebecca Garnett which will merge into the first count.

And he is guilty of the charge of reckless endangerment with regard to the persons of James Littlejohn, Tequila Frazier, Travell Dumar and Carroll Walker; but not guilty as to the others, Darnell Budd among them.

Judge Messitte then concluded:

The range of my decision must not be misapprehended. I respect and admire our police and I support them as we all should. Felons should take no comfort in this decision. There will be many occasions where displaying, chambering, pointing, and even firing of a shotgun by police will be the appropriate response. May 23rd, 1991, on Larchmont Terrace in Gaithersburg, I am deeply sad to say, was not one of them.

Albrecht noted on appeal to the Court of Special Appeals on July 20, 1992, contending that there was insufficient evidence presented at trial to support the involuntary manslaughter conviction and the two reckless endangerment convictions and, hence, that the verdicts were clearly erroneous. In reversing the judgments of the trial court, the intermediate appellate court stated:

We hold that, given the factual finding that Officer Albrecht did not fire the shotgun intentionally, the remaining evidence was not legally sufficient to support a finding of gross criminal negligence, to wit, evidence that he was acting without justification and in such a way as to exhibit a reckless and wanton disregard for human life. Neither was the remaining evidence, once any fact finding that the gun

had been fired intentionally was rejected, legally sufficient to support a verdict that Officer Albrecht was guilty of misconduct so reckless as to constitute a gross departure from the standard of conduct that a reasonable police officer would observe. We hold, therefore, that the verdicts of guilty of involuntary manslaughter and of reckless endangerment, necessarily predicated on such states of mind, were clearly erroneous.

*Albrecht,* 97 Md.App. at 688, 632 A.2d at 191.

We granted the State's petition for a writ of certiorari to review the judgment of the intermediate appellate court. Upon our own review of the extensive record in this case, including over 1,750 pages of trial testimony, we conclude that the Court of Special Appeals erred in its determination that there was insufficient evidence to support Albrecht's convictions. Specifically, we find that there was sufficient evidence presented from which the trial court could have concluded that Albrecht was both grossly negligent and reckless in failing to exercise the extreme caution that he was required to exercise in the handling and the use of his shotgun. We find that sufficient evidence was presented from which the trial court could have found that the use of deadly force against Rebecca Garnett would have been unjustified under the circumstances. We find that the evidence was sufficient to establish that, notwithstanding the fact that Rebecca Garnett did not pose any danger to either Albrecht himself or to third parties, Albrecht took substantial steps to use deadly force against her—to wit, racking his shotgun and aiming it, with his finger on the trigger, at Garnett. Ultimately, deadly force was used, without justification, and Rebecca Garnett was killed. We conclude that sufficient evidence was presented from which a rational trier of fact could have found that Albrecht's actions on May 23, 1991, in their totality, were both grossly negligent and reckless.

### III.

As Judge Messitte noted, the "overriding question" in this case was whether Albrecht's conduct constituted a "gross and

wanton deviation from reasonable conduct" such as would support convictions of involuntary manslaughter and reckless endangerment. As such, the evidence presented at trial, both in the form of documentary and testimonial evidence, focused upon the issue of whether Albrecht had acted as a reasonable police officer under the circumstances. We shall now review that evidence. Once again, however, we note that in our review of Albrecht's convictions, it is neither our duty nor our role to assess the credibility of the witnesses who testified nor to weigh the evidence presented. Rather, we shall only review that evidence which supported the State's case in order to determine whether *any* rational trier of fact could have convicted the defendant of the crimes charged.

At trial, both sides presented extensive evidence regarding the policies and procedures of the Montgomery County Police Department with respect to the use of deadly force and with respect to the display and use of shotguns during felony stops. The State introduced into the record portions of the Montgomery County Police Department's Field Operations Manual, referred to as Departmental Directive DD 83–15, which contains various directives on the use of deadly force and the use of firearms by Montgomery County police officers. The purpose of DD 83–15 is identified on the face of the document: "[t]o provide guidelines and detail restrictions concerning the utilization of deadly force in any form by officers of the Department." With respect to the use of deadly force in defense of self or others, Departmental Directive DD 83–15, entered as State's Exhibit 13A, provides that officers may only use deadly force "to defend themselves, or another person from what they have reasonable cause to perceive as an immediate threat of death or serious bodily injury." *Id.* at 2. Pursuant to DD 83–15, officers may use deadly force to apprehend fleeing felons only:

> (a) when they have probable cause to believe the crime committed was murder, first degree rape, first degree sexual offense, armed robbery, or assault with intent to commit any of the foregoing, *and*

(b) they have probable cause to believe the person fleeing committed the crime or the person fleeing escaped while being held in legal custody as a suspect in one of the above listed crimes, *and*

(c) that failure to immediately apprehend the person may place the officer, another law enforcement officer, or the public in danger of death or serious bodily injury.

*Id.* DD 83–15 further provides that "[t]he officer's decision to use deadly force against a fleeing felon will be judged by the reasonableness of his/her action given the facts and circumstances available to the officer at the time the force is employed." *Id.*

With respect to the use of firearms, DD 83–15 provides that "[f]irearms may be drawn whenever an officer has reason to fear for his safety or the safety of others." *Id.* at 3. On the use of shotguns, in particular, DD 83–15 provides as follows:

The shotgun is particularly useful when police anticipate confronting an armed subject or group of subjects in a high-risk arrest situation. However, officers must exercise *extreme caution* when removing the shotgun from the vehicle when the shooting background presents a potential danger to innocent bystanders such as within a store, on a crowded street, or other similar circumstances.

*Id.* (emphasis added). DD 83–15, however, does not specify when an officer should draw his service revolver rather than his shotgun. The Departmental Directive also does not specify the circumstances under which an officer may display *and* rack his shotgun, or the circumstances under which an officer may display, rack, *and* aim his shotgun at a suspect. With respect to the firing of the shotgun, however, DD 83–15 does provide that "[o]fficers must exercise caution when discharging a firearm to avoid endangering the lives of bystanders." *Id.*

The State elicited testimony from Lieutenant John Meiklejohn, Director of Training for the Montgomery County Police Department, regarding the directives contained in DD 83–15. Lieutenant Meiklejohn noted that there are various levels of

force that an officer may use when arresting suspects of a crime:

> Well, specifically in the defensive tactics area we try to teach [police candidates] that they have the right to use that force which is necessary to effect an arrest, to protect themselves, or control a situation. And in that they received training in the use of their voice to command people, their mere presence which is legal and authorized Government authority, to physical control which is placing their hands on an individual to physically attempt to control them, to the use of a protective instrument, which is a PR–24, a nightstick, or other types of things that you may, under certain circumstances, use to protect yourself or help control an individual, to the possibility of using deadly force with your firearm.

Meiklejohn testified that an officer's decision to draw *any* firearm must be supported by a clear and present danger to the safety of the officer himself or to third parties. According to Meiklejohn's testimony, there is no directive on choice of weapon when the decision to draw a firearm is made, and the initial decision of whether to draw the shotgun as opposed to a handgun is left to the officer's individual discretion. Meiklejohn further testified that he did not provide any instruction to police candidates at the police training academy about the selection of a weapon to be displayed or used by an officer in any given situation. According to Meiklejohn, pursuant to Montgomery County's departmental directives, a shotgun may be used and is often the appropriate weapon to use when an officer must confront multiple suspects in a high risk situation.

Meiklejohn also testified that once the decision to display the shotgun has been made, the officer must pay particular attention to his shooting background and to the presence of innocent bystanders because the shotgun is an "area weapon" and it "is possible to hit more than one person" with a single discharge:

> [QUESTION]: Now, is there another segment of this policy, Lieutenant, that specifically addresses shotguns?

[MEIKLEJOHN]: Yes, sir.

[QUESTION]: And can you tell the Judge about that please?

[MEIKLEJOHN]: You can find it on page 3, Your Honor, under Roman Numeral III(c), and it pretty much says that shotguns are useful when confronting armed subjects or groups of subjects, especially in high risk arrest situations, but that the weapon—There should be some care and caution when using that weapon because not just that weapon, but anytime, you have to concern yourself with the possibility of the shooting background and the danger you pose to bystanders that may be in the area.

[QUESTION]: Now, in fact, the phrase that's used there is "extreme caution?"

[MEIKLEJOHN]: Yes, sir.

Testimony was also received from Sergeant Robert Muehlenhort, an instructor at the Montgomery County police training academy in 1987 when Albrecht was a police candidate. According to Muehlenhort, an officer's shotgun is considered the "ultimate weapon to utilize" and constitutes the highest level of force that an officer may use to respond to a particular situation. Sergeant Muehlenhort testified that an officer may, in his discretion, make the determination of whether to use his shotgun, but that the officer must be able to articulate a clear and present danger to himself or others before the shotgun may be used:

[A]n officer has to make an independent decision of whether to use, and what level of force to use, and he must articulate as to the directive a clear and present danger to himself and others. And that means every officer that's involved in the situation. He must be able to articulate that phrase of being a clear and present danger to himself or others.

With respect to the training received by police candidates at Montgomery County training academy, the following testimony was elicited from Muehlenhort:

[QUESTION]: Do you teach the officers to rack a shotgun every time they take one out to display it?

[MUEHLENHORT]: No.

[QUESTION]: Do you teach them to put their finger on the trigger and aim it every time they take it out to display it?

[MUEHLENHORT]: No, sir.

According to Muehlenhort, police candidates are taught that the shotgun should not be racked unless the officer intends to shoot the weapon. Muehlenhort explained:

> [b]ecause once you chamber the weapon—Let's say, like in a lot of cases some officers would, in a building search, when you have an alarm off or something and you're going through the building, and if you rack one in it is a potential any time you can trip and fall and you could have a round discharge from the weapon. And it takes such a short time to rack and fire a shotgun. We're talking seconds, really, when it comes down to it, and give that little bit of latitude in there. It is a dangerous weapon, by all means, and you can trip and fall doing things. That can actually happen. And we try to avoid racking it unless you're going to seriously use it.

In that regard, Muehlenhort testified that there are situations which call only for the display of the shotgun, such as "high-density" situations where "someone could seriously be hurt." Muehlenhort stated that he would not rack his own shotgun unless he found himself in a "severe situation" where he would have to defend his own or another person's life.

Muehlenhort further testified that, as an instructor at the training academy, he recommended to police candidates that the safety on the shotgun be kept engaged and that the shotgun should be racked and aimed only when an officer intends to fire the weapon and would be justified in doing so:

> if you're going to point it at someone you're going to have to articulate that you're in a clear and present danger. If you point it and it's already racked, you're going to shoot it.

When confronted with a hypothetical question based upon the facts of Albrecht's shooting, Muehlenhort testified that it was within the departmental guidelines for an officer to display his shotgun under those circumstances and he himself would have

displayed the shotgun. He testified, however, that there was no reason, under those circumstances, for an officer to rack his shotgun and that he would not have racked his shotgun. Muehlenhort further stated that he would not have aimed the shotgun at Garnett with his finger on the trigger.

The State also elicited testimony from Officer Michael McNally, a firearms instructor at the Montgomery County police training academy. McNally testified that police candidates are taught that the display and racking of the shotgun can facilitate an arrest because of the distinct and intimidating sound that a shotgun makes when it is racked. McNally stated that the shotgun is "more of an offensive weapon" than a handgun because the shotgun discharges "multiple projectiles," creating "a better chance of [the officer] hitting whatever it is [he's] intending on shooting at." Although noting that Montgomery County has no official policy on whether the shotgun's safety mechanism should be engaged or disengaged when it is displayed, McNally testified that it is the custom and habit of Montgomery County police officers to keep the safety mechanisms on their shotguns disengaged. McNally further testified that police candidates were instructed that an officer's trigger finger should be kept on the trigger guard and away from the trigger when the shotgun's safety is disengaged, so as to prevent "inadvertent[ ]" discharges:

[QUESTION]: In your opinion is the recommendation to officers that they always have the safety disengaged unsafe?

[MCNALLY]: No. I don't think it's unsafe.

[QUESTION]: Why don't you think it's unsafe, because it sounds to the layman like if you've got a safety you should tell people to put it on.

[MCNALLY]: Well, if you have it off I do tell everybody that you should have your finger off the trigger until you're on the target.

\*       \*       \*       \*       \*       \*

[MCNALLY]: Because if you're assuming that [the safety is] always off, you know it's ready to fire. But if you keep your finger off of the trigger and outside the trigger guard

until you're on the target, it's going to be safe. It's just not going to go off inadvertently.

Several witnesses also testified regarding the addition of the bandolier and extra rounds of ammunition to Albrecht's shotgun. Although Montgomery County's departmental guidelines permit officers to attach slings or bandoliers to their shotguns, Officer McNally testified that the shotguns issued by Montgomery County do not come equipped with such slings. McNally also stated that of the five hundred shotguns carried by members of the police department, he knew only of two shotguns, in addition to Albrecht's, that had been fitted with bandoliers. McNally further testified that the addition of the bandolier and extra ammunition to Albrecht's weapon caused the "barrel to move somewhat." Lester Lemerick, Firearms Program Manager and Chief Gunsmith for the Federal Bureau of Investigations, testified that he had examined Albrecht's shotgun and had found that the balance point of Albrecht's shotgun was adversely affected by the addition of extra equipment. Lemerick testified that the added weight of the bandolier and extra shells tended to pull the barrel of the shotgun down and increased the likelihood of an accidental discharge. Lemerick concluded that removal of the bandolier and extra shells would make the shotgun a safer weapon and that, with the bandolier and extra ammunition attached, he would not have approved the shotgun for use by the regular agent. James Hennings, a research designer from the Remington Arms Company, testified that the added weight of the sling and extra rounds of ammunition made Albrecht's shotgun "more cumbersome" to handle. Finally, Lieutenant Meiklejohn testified that very few officers in Montgomery County carry a sling holding extra ammunition because there is no need for it; the shotgun itself holds four rounds of ammunition and the average number of rounds expended by a police officer in a firefight ranges from only 2.5 to 2.8 rounds.

Former Sergeant Raymond Griffin, a former Commander of the In–Service Training Division at the Montgomery County police training academy, stated that the shotgun is a "particularly dangerous weapon" which "creates a pattern of destruc-

tion" when used, and that an officer must exercise "extreme caution" in the use of that weapon. Griffin, who was called by the defense, testified that the determining criterion for when an officer should draw his shotgun during a felony stop is "the potential for some kind of attack," "when the officer felt his life or another life—another person's life—was in danger." According to Griffin, an officer is entitled to rack the shotgun and to point it at a suspect if he feels his life or someone else's life is threatened; the decision to aim a loaded shotgun at a suspect should be predicated upon a reasonable perception that the person at whom it is being aimed poses a threat. In that regard, Griffin testified that officers are not permitted, trained, or encouraged to rack and aim their shotguns as a matter of course during all felony stops. Griffin testified that there are gradations in the threat of force that an officer should reasonably employ to take control of a situation, and that the level of force an officer uses must be reasonable under the circumstances.

According to Griffin, when an officer has drawn, racked, and aimed his shotgun, the officer's finger is permitted to be within the shotgun's trigger guard. He testified that an officer should not place his finger on the shotgun's trigger unless and until the officer believes that he may have to shoot the suspect. According to Griffin's testimony, an officer approaching a suspect with a weapon employed for the purposes of making an arrest is responsible for the suspect's safety. Additionally, Griffin testified that when an officer uses any weapon, he must always use extreme caution because of the danger posed to bystanders in the area.

The defense also called various Montgomery County police officers to testify as to their training and understanding of the Montgomery County departmental directives governing the use of shotguns and of deadly force. Officer Joyce M. Barrow, a Montgomery County police officer who had been a classmate of Albrecht's at the training academy, testified that police candidates were instructed that they are to respond with force that is appropriate to the circumstances, and that the shotgun must be used with extreme caution. Officer

Donna Howard, who was also a classmate of Albrecht's at the training academy, testified that the racking and aiming of a shotgun indicates that the officer has a reasonable belief that she may have to shoot the person at whom she is aiming. Deputy Sheriff John Kenworthy also testified that he was in Albrecht's training class, and that he and his fellow candidates were instructed that officers must use extreme caution when using a shotgun, paying particular attention to the shooting background, so as to avoid exposing innocent bystanders to unwarranted risk as much as possible.

Officer Thomas provided his own account of the events which occurred on May 23. According to Thomas, when he arrived on the scene at Larchmont Terrace, he got out of his squad car without his shotgun. As he heard Albrecht racking his shotgun, however, Thomas reached back into his car for his own, concluding that Albrecht must have "felt something I didn't feel, he saw something I didn't see." Noting that a shotgun is "very high," if not the "highest," in terms of the levels of force an officer may use in a given situation, Thomas testified that, at the time he exited his cruiser on May 23, he believed that the situation could be handled with a handgun. Thomas stated that Rebecca Garnett "had done nothing" which would have led him to believe it was appropriate to remove his shotgun and aim it at her.

Albrecht testified on his own behalf. Describing the initial moments after he arrived at Larchmont Terrace, Albrecht stated that he "felt fairly threatened, because I had two—two—people who had just been involved in a serious incident and I was told there might be a gun in the car." Albrecht testified that he decided to draw his shotgun because he faced multiple suspects, and because he had been given information about the possibility that a gun was in the Chevrolet. Albrecht admitted, however, that he did not see any of the suspects with a gun or with any other weapon, and that he did not feel threatened by Rebecca Garnett:

[QUESTION]: But you didn't think Becky Garnett was going to kill you?

[ALBRECHT]: Not at the point where I had looked at her and looked away from her. No. Not when I checked her off.

[QUESTION]: She had done nothing, had she, to indicate that she was going to kill you?

[ALBRECHT]: At that moment in time? No.

[QUESTION]: At any moment in any time?

[ALBRECHT]: No.

[QUESTION]: Are you sure?

[ALBRECHT]: Yes.

As he brought his racked shotgun towards Garnett, Albrecht testified that she had complied with his command to stop moving:

[A]s I was yelling, I started bringing the gun up to point it in the general direction of the car. I looked at her [Garnett]. She had stopped. She was holding a bag of chips in her left hand, in her right hand, and in my mind I checked her off. I looked at Mr. Budd. I said, "He's still a threat." I looked at Mr. Littlejohn, "He's still a threat." I looked at Ms. Garnett. I said, "She's not—" I didn't think to myself that she was a threat. She was standing in the open. She had a bag of chips in her hand. Her other hand was out. She was wearing a white blouse and beige—orange—shorts that were fairly tight fitting on her and I just didn't feel threatened by her at that point. And I was beginning to bring the gun up to put it in a position to bring it to bear on Darnell Budd, because he's still behind the car and he's making a lot of motions with his hands. He's still moving around a lot. And just as I was doing that I heard an explosion.

Albrecht repeatedly testified that he did not believe that Garnett was a threat, that he had "checked her off," and that "she was the least of [his] worries, as far as all three people in that vehicle were concerned":

[A]s I was getting out of the car with the shotgun, she was still eating chips out of the bag of Fritos, and even as I was yelling, "Stop! Freeze!" she was still fairly casually doing

this. But as I started to turn towards her, and I started to bring the gun to bear on—As I was bringing it up into a firing position, or shooting position, she stopped and that's where I checked her off in my mind. You know, I was thinking to myself, "Okay. She has complied. Now you can concentrate on Mr. Budd." And as I started to bring the gun to bear over that way, that's where it went off.

When asked about the placement of his finger when he aimed the shotgun, Albrecht responded as follows:

[QUESTION]: You've testified that you were trained when you aimed the gun you had your finger on the trigger?

[ALBRECHT]: Once you acquired a target. Yes.

[QUESTION]: All right. And you had acquired a target?

[ALBRECHT]: At which point in time?

[QUESTION]: At the time that you pulled out the shotgun. You intended to aim it, didn't you.

[ALBRECHT]: At that vehicle. Yes.

[QUESTION]: And so your finger was on the trigger, wasn't it?

[ALBRECHT]: Not—No. I didn't put my finger on the trigger while I was holding it here, bringing it around. No. I mean, what you're trained to do is when you have the gun pointed, you have it locked in, and you know what you're aiming at and you know what you're going to be shooting, then to place your finger on the trigger. But I didn't have that finger on the trigger, to the best of my recollection as I was bringing it up and around. I think I was in the act of putting it from the trigger guard onto the trigger as I was bringing it to bear on Mr. Budd, and I think that was a factor in why it went off as it was coming around.

Albrecht further testified, however, that he was "startled" into pulling the trigger:

[QUESTION]: And she [Garnett] turned, and that just very well may have caused you to pull the trigger? Isn't that a fact?

[ALBRECHT]: I don't think that's a fact. I mean, you're just applying it very specifically. I could have been—I don't know what set that shotgun off. I don't remember looking at her when the gun went off. I didn't have a focus on her when the gun went off.

[QUESTION]: But that is a possibility, isn't it?

[ALBRECHT]: It's a possibility, yes.

[QUESTION]: That you intentionally pulled the trigger in response to a sudden movement by her, over-reacting to your perceived threat from her?

[ALBRECHT]: Well, now, see, now you're saying something totally different. You're saying it was intentional and it was something that I perceived, or something else. And that's not what happened. I think the possibility is there that there was some type of startle reaction. Whether it was her or Mr. Budd that caused those muscles to contract, or it might have been the weight of the gun coming down pulling against the finger. But as far as it being an intentional act, or a possibility of an intentional act? I think you've gone way too far, there, and I can't agree with that. I'm sorry.

Albrecht's statement that he was "startled" into pulling the trigger reveals that his finger must have been placed on the shotgun's trigger, as it would have been impossible for Albrecht to pull the trigger if his finger had been placed inside the shotgun's trigger guard or, for that matter, on any other part of the shotgun.

Having set forth, in some detail, the documentary and testimonial evidence which supported the State's case against Albrecht, we must now address the specific question we face: was this evidence legally sufficient to show, or to support a rational inference of facts which could fairly convince a rational trier of fact of Albrecht's guilt of involuntary manslaughter and reckless endangerment beyond a reasonable doubt? We answer that question in the affirmative.

## IV.

In Maryland, involuntary manslaughter is a common law felony, generally defined as an unintentional killing done without malice, (1) by doing some unlawful act endangering life but which does not amount to a felony, or (2) in negligently doing some act lawful in itself, or (3) by the negligent omission to perform a legal duty. *Cox v. State,* 311 Md. 326, 331–32, 534 A.2d 1333, 1335–36 (1988); *see also State v. Gibson,* 4 Md.App. 236, 242, 242 A.2d 575, 578–79 (1968). It has long been stated that where the charge of involuntary manslaughter is predicated upon the allegation that the defendant committed a lawful act in a negligent manner, a conviction of manslaughter will not lie on a showing of simple negligence or misadventure or carelessness but must rather be predicated upon that degree of aggravated negligence which is termed "gross" negligence. *See Duley v. State,* 56 Md.App. 275, 289, 467 A.2d 776, 796 (1983); *Mills v. State,* 13 Md.App. 196, 200, 282 A.2d 147, 149 (1971), *cert. denied,* 264 Md. 750 (1972); *Rolfes v. State,* 10 Md.App. 204, 207, 268 A.2d 795, 796 (1970). As Chief Judge Murphy, then Chief Judge of the Court of Special Appeals, explained for the Court in *Mills v. State,*

> It is well settled in this State that where a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself, the negligence necessary to support a conviction must be gross or criminal, *viz.,* such as manifests a wanton or reckless disregard of human life. A causal connection between such gross negligence and death must exist to support a conviction, although it is not essential that the ultimate harm which resulted was foreseen or intended. On the other hand whether an accused's conduct constituted gross negligence must be determined by the conduct itself and not by the resultant harm. Nor can criminal liability be predicated on every careless act merely because its carelessness results in injury to another.

13 Md.App. at 200, 282 A.2d at 149 (citations omitted); *see also State v. Gibson,* 4 Md.App. at 242, 242 A.2d at 579.

In determining whether a defendant's actions constituted gross negligence, we must ask whether the accused's conduct, "under the circumstances, amounted to a disregard of the consequences which might ensue and indifference to the rights of others, and so was a wanton and reckless disregard for human life." *Duren v. State,* 203 Md. 584, 590, 102 A.2d 277, 280 (1954); *see also Johnson v. State,* 213 Md. 527, 531, 132 A.2d 853, 855 (1957); *Allison v. State,* 203 Md. at 5, 98 A.2d at 855; *Hughes v. State,* 198 Md. 424, 432, 84 A.2d 419, 422 (1951). Stated otherwise, the accused must have committed "acts so heedless and incautious as necessarily to be deemed unlawful and wanton," *Insurance Co. v. Prostic,* 169 Md. 535, 539, 182 A. 421, 423 (1936) (citation omitted), manifesting such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of an indifference to consequences. *See Duren v. State,* 203 Md. at 590, 102 A.2d at 280; *State of Maryland v. Chapman,* 101 F.Supp. 335, 341 (1951). It is only conduct which rises to this degree of gross negligence upon which a conviction of involuntary manslaughter can be predicated.

Although a conviction for involuntary manslaughter necessarily requires that an injury—indeed, the ultimate injury, death—was inflicted upon a third party, the crime of reckless endangerment does not require that the defendant actually cause harm to another individual. Maryland's reckless endangerment statute, Maryland Code (1957, 1992 Repl. Vol.) Article 27, § 120(a), provides, in pertinent part:

Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both.

As we explained in *Minor v. State,* 326 Md. 436, 605 A.2d 138, 141 (1992), Maryland's reckless endangerment statute is aimed at deterring the commission of potentially harmful conduct

before an injury or death occurs. As a consequence, a defendant may be guilty of reckless endangerment even where he has caused no injury:

It is readily evident from the plain language of § 120(a) that it was enacted to punish, as criminal, reckless conduct which created a substantial risk of death or serious physical injury to another person. It is the reckless conduct and not the harm caused by the conduct, if any, which the statute was intended to criminalize.

*Id.,* 605 A.2d at 141. In *Minor,* we explained that in determining whether a defendant's conduct was reckless,

The test is whether the appellant's misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe, and thereby create the substantial risk that the statute was designed to punish.

*Id.* at 443, 605 A.2d at 141.

■ In determining whether an accused's actions were grossly negligent or criminally reckless, the standard against which a defendant's conduct must be assessed is typically the conduct of an ordinarily prudent citizen similarly situated. As the Court of Special Appeals correctly noted in its opinion, however, where the accused is a police officer, the reasonableness of the conduct must be evaluated not from the perspective of a reasonable civilian but rather from the perspective of a reasonable police officer similarly situated. *Albrecht,* 97 Md.App. at 642, 632 A.2d at 169. As the intermediate appellate court explained:

Under almost all circumstances, the gratuitous pointing of a deadly weapon at one civilian by another civilian would almost certainly be negligence *per se,* if not gross negligence *per se.* A police officer, on the other hand, is authorized and, indeed, frequently obligated to threaten deadly force on a regular basis. The standard of conduct demanded of a police officer on duty, therefore, is the standard of a reasonable police officer similarly situated.

*Id.,* 632 A.2d at 169; *see also Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443, 455 (1989).

In reviewing the sufficiency of the evidence presented on the charges of involuntary manslaughter and reckless endangerment, we emphasize that we are not sitting as the trier of fact and, therefore, we are not to ask ourselves whether *we* would convict based upon the evidence presented. Again, lest we have not been clear, we repeat that we are asked only to determine whether *any* rational trier of fact could have found Albrecht guilty of the crimes charged based upon the evidence presented at trial. For the reasons discussed herein, we find that there was sufficient evidence presented at trial from which the trial court could have concluded that Albrecht did not act as a reasonable police officer under the circumstances but rather acted in a grossly negligent and reckless manner.

### V.

Albrecht's position is that he acted reasonably. He contends that there was no evidence presented at trial from which the trial court could have concluded that his conduct on the afternoon of May 23, 1991, constituted a violation of a policy, practice, or directive of the Montgomery County Police Department. In the absence of such a finding, Albrecht argues, no rational trier of fact could have found that his conduct constituted gross negligence or a gross departure from what would have been the conduct of a reasonable police officer under the same circumstances. We disagree. In support of his argument, he presents and construes the evidence in the light most favorable to him, overlooking or ignoring the evidence presented which supports the verdict. This is not, as Albrecht suggests, a case in which a police officer has been held criminally liable for conduct that was without a doubt in compliance with standard police guidelines, procedures or practices. Rather, we find the record replete with evidence from which the trial court could have concluded

that Albrecht did not comply with Montgomery County departmental guidelines, procedures or practices.[4]

As discussed above, the Montgomery County police department's Field Operations Manual specifically provides that an officer may draw a firearm when the officer has "reason to fear for his safety or the safety of others," but that "officers must use caution when discharging a firearm to avoid endangering the lives of bystanders." With respect to the use of a shotgun, "officers must exercise *extreme caution* when removing the shotgun from the vehicle" because of the danger that a discharge of the weapon may present to innocent bystanders. DD 83–15 at 3 (emphasis added). According to both DD 83–15 and the testimonial evidence presented, an officer may use deadly force only when the officer *reasonably* believes deadly force is necessary to avoid "death or serious bodily injury" from being caused to himself, another officer, or third parties. Although the trial court found that Albrecht's use of deadly force against Rebecca Garnett was not intentional, there was ample evidence from which the trial court could have concluded that Albrecht did not comply with standard police procedures when he took *substantial steps to use* deadly force under the circumstances. Thus, the trial court could have concluded that Albrecht not only failed to exercise "extreme caution," but that he acted in a grossly negligent and reckless manner, thus failing to exercise even the most ordinary caution required by the guidelines.

Montgomery County's departmental directives afford police officers much discretion with respect to an individual officer's decision to use a firearm. In the exercise of such authorized discretion, a police officer must act in a reasonable manner. Gross negligence in the exercise of discretion is grounds for criminal liability.

---

**4.** Because we find that the evidence was sufficient for the trial court to find that Albrecht did *not* act in accordance with police guidelines, policy, or practices, we need not, and do not, address Albrecht's contention that if an officer follows police directives, he is, as a matter of law, acting as a reasonable person.

According to Albrecht's own testimony, he did not believe that Rebecca Garnett posed any danger to him or to any other person, she was "the least of [his] worries," and he had "checked her off." Indeed, his position at trial was that he did not aim his shotgun at Rebecca Garnett. Officer Thomas testified that Rebecca Garnett had "done nothing" to warrant having a shotgun racked and aimed at her. According to Muehlenhort's testimony, police officers should not rack and aim their shotguns unless they intend to fire them. According to the testimony of McNally, an officer should not place his finger on the shotgun's trigger until he is ready to fire the weapon. Officer McNally testified that police candidates are taught to keep their fingers on the trigger *guard* and away from the shotgun's trigger. Griffin testified that the decision to aim the shotgun should be predicated upon a reasonable perception that the person at whom it is being aimed poses a threat, and that, if aimed, the officer's finger is permitted to be within the shotgun's trigger guard. Officer Barrow also testified that Albrecht's finger should have been on his shotgun's trigger guard. The trial court could have found that Albrecht racked his shotgun, aimed it at Garnett, and placed his finger on the shotgun's trigger, notwithstanding the fact that he had no reason to believe that it would be necessary to shoot her. Additionally, according to the testimony of several trial witnesses, a number of adults and children were present on the playground area and in Albrecht's shooting background as he aimed his shotgun at Rebecca Garnett. From the documentary evidence at trial, contrary to Albrecht's assertion, the trial court could find that these individuals were not distant bystanders, but rather that they were in the playground area and on the sidewalk directly behind the Chevrolet, literally within feet of Rebecca Garnett. Certainly, as the trier of fact, Judge Messitte was entitled to accept and rely upon all of the above testimony in rendering his verdicts.

Chief Judge Murphy, in his dissent, suggests that "[w]e must freeze in time the split second before the gun went off and inquire as to whether, at that instant, Officer Albrecht could have been found guilty of gross criminal negligence and

reckless endangerment or not." The dissent goes on to state that "it is not the discharge of the shotgun or the death of Rebecca ... that is being assessed; the focus is exclusively on the antecedent action of unlimbering, 'racking,' and aiming the shotgun." The dissent relies on the conclusion of the intermediate appellate court that "there is no evidence that Albrecht's conduct was even unjustified, let alone conduct evidencing a reckless and wanton disregard of human life." This conclusion ignores the testimony at trial that we have previously recounted, and particularly that on the day in question, considering the facts and circumstances facing Albrecht, he should not have had his finger on the trigger, but rather it should have been on the trigger guard.

In sum, we find that there was sufficient evidence presented to support the trial court's conclusion that although "[t]here will be many occasions where displaying, chambering, pointing, and even firing of a shotgun will be the appropriate response ... May 23rd, 1991, on Larchmont Terrace in Gaithersburg ... was not one of them." The State adduced sufficient testimony from which the trial court could have concluded that a reasonable Montgomery County police officer would not have acted as Albrecht did on this occasion, in drawing and racking a shotgun fitted with a bandolier and bringing it to bear, *with his finger on the trigger,* on an unarmed individual who did not present a threat to the officer or to any third parties, in a situation where nearby bystanders were exposed to danger. In the final analysis, we cannot say that the trial court was clearly erroneous in determining that Albrecht's conduct, under the circumstances, manifested a wanton and reckless disregard for the safety of Rebecca Garnett and for the safety of those persons in the immediate vicinity. We therefore cannot, as a matter of law, find that trial judge erred in concluding that Albrecht's actions, in their totality, were both reckless and grossly negligent.

For the reasons stated herein, we hold that the Court of Special Appeals erred in reversing Albrecht's convictions.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO CONSIDER ISSUES RAISED BUT NOT DECIDED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

CHASANOW, Judge, concurring.

I concur with the result and join in the majority opinion. My reason for writing separately is merely to extend the majority analysis by literally a fraction of an inch. I also agree with Judge Murphy and the Court of Special Appeals up to a point. If we could freeze frame and keep "exclusive focus not on the discharge of the shotgun and its deadly consequence but only on the act of loading and aiming that shotgun ...," 97 Md.App. 630, 644, 632 A.2d 163, 170 (1993), then as a matter of law, Officer Albrecht should not be guilty of manslaughter or reckless endangerment. But we should not freeze frame and stop our analysis before the trigger was pulled. We cannot assess Albrecht's culpability in taking Rebecca Garnett's life and, in doing so, exclude the ultimate act that took her life—pulling the trigger.

The trial judge found that the act of pulling the trigger was unintentional; he did not find that it was reasonable. The intermediate appellate court assumes the unintentional shooting is a non-negligent shooting. Albrecht did not intentionally pull the trigger, but the trial judge was justified in finding he negligently, carelessly or even recklessly pulled the trigger. There was no external cause for the shotgun discharge, and the fact that Albrecht may have been "startled into pulling the trigger" of a loaded, racked, and aimed shotgun need not, as a matter of law, excuse his carelessness in doing so. The pulling of the trigger could be found to be a careless act that, when considered along with all the antecedent acts, at least tips the scale to permit a finding of gross negligence.

Police officers do not have to act like heroes in old silent film westerns and always let the bad guys draw first. They are entitled to draw their weapons and be ready to use them when confronted with a tense, dangerous situation. But when a police officer intentionally places himself or herself a mere trigger pull away from taking the life of an innocent person, if the officer then carelessly pulls that trigger and kills an innocent person, a finding of manslaughter or reckless endangerment is not erroneous as a matter of law. "Accidently" pulling a trigger of a loaded, aimed shotgun can constitute involuntary manslaughter just as "accidently" swerving a truck into a group of school children standing by the side of the road at a bus stop can constitute involuntary manslaughter.

MURPHY, Chief Judge, dissenting.

Taking into account all of the evidence before the trial judge most favorable to the State's case, I agree with the Court of Special Appeals that the trial judge's factual findings did not, in light of the governing law, permit a guilty verdict of the offenses charged by the indictments. Writing for a unanimous three-judge panel, Judge Moylan, with the concurrence of Judges Fischer and Motz, carefully analyzed the 1750 page transcript of trial testimony. The court identified the issue as whether Officer Albrecht's conduct in unlimbering the shotgun, in "racking" a shell into the chamber, and in pointing it at Rebecca Garnett in the first instance was in itself a criminal act. If it was, the court said that it would be equally blameworthy and reprehensible whether the gun went off and Rebecca was killed or not. The court then said if, on the other hand, the acts of unlimbering and pointing the weapon were not in and of themselves criminal, the unintended death of the victim will not make them so. *Albrecht v. State*, 97 Md.App. 630, 643–644, 632 A.2d 163.

In his opinion for the court, Judge Moylan deemed it essential to keep "exclusive focus not on the discharge of the shotgun and its deadly consequence but only on the act of loading and aiming that shotgun in the first instance." *Id.* at

644, 632 A.2d 163.   In this regard, the court said: "We must freeze in time the split second before the gun went off and inquire as to whether, at that instant, Officer Albrecht could have been found guilty of gross criminal negligence and reckless endangerment or not." *Id.*

The case law is well settled in Maryland that where a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself, the negligence necessary to support a conviction must be gross or criminal, namely such as manifests a wanton or reckless disregard of human life. The gross criminal negligence must add up to an extreme degree of indifference to the human consequence of one's actions that can only be described as wanton.   "As with grossly negligent manslaughter, it is the allegedly reckless conduct itself that is in issue and not the harm that flows from it;  ... it is not the discharge of the shotgun or the death of Rebecca ... that is being assessed;  the focus is exclusively on the antecedent action of unlimbering, 'racking,' and aiming the shotgun." *Id.* at 647–648, 632 A.2d 163.

The intermediate appellate court points out quite accurately that the State seeks to establish such a gross departure from the standard of care exercised by a reasonable person by asserting that the very act of pointing a loaded weapon at another constitutes such a gross departure *per se* and establishes thereby the necessary recklessness.   Cases relied upon by the State for this proposition are not, however, apposite since each presents a situation where a civilian without any occupational mandate pointed a loaded weapon at another civilian;  the cases do not involve a police officer as a defendant—an individual empowered to carry a weapon and, under many circumstances, to point and even use it.

The court next said:

"... [W]e see no evidence in this case from which a fact finder could have been persuaded beyond a reasonable doubt that there was on the part of the appellant such gross criminal negligence so as to demonstrate a wanton disregard for human life.   Nor do we see any gross deviation or

gross departure from the standard of conduct that a reasonable police officer would employ in similar circumstances. Rebecca Garnett suffered a tragic death. The appellant was unquestionably the homicidal agent. For purposes of our review, however, it is a given that the discharge of the gun was accidental. The only issue before us is whether the pointing of the gun at Rebecca Garnett was, in and of itself, a criminal act. Given the demanding definition of gross criminal negligence, we see no evidence that could rationally satisfy that requirement.

"Utilizing the standard of the reasonable police officer, we assess the circumstances from the point of view of a police officer who is looking for one or more culprits in a stabbing, who has been told that the two or three young men involved are drug pushers, who has been told that the subjects may be armed, who has just engaged in a high-speed chase, and who has just located the suspect car with three apparent occupants. The officer is trained to use his own police cruiser as a shield when he confronts a potentially dangerous situation and to make sure the target area is neutralized before proceeding to a calmer inspection. With respect to any reasonable officer in such a circumstance, we have to conclude that his adrenaline would be pumping, his heart would be pounding, and he would be fearful for his own life. When he orders suspects to 'freeze,' he is intensely sensitive to compliance with that order.

"Officer Thomas was watching Darnell Budd even as the appellant was watching Rebecca Garnett. Officer Thomas's description of his intense concentration on any hand movement or twitching by Darnell Budd illustrates the emotion that inevitable permeates such a confrontation:

'He was facing in our direction. And it was like—It's hard to—When you're holding a gun on somebody and they're doing—they're just not standing still, Your Honor—its hard to explain, you can't say what they're doing with their hands, but their hands, they're not in their pockets, but they're not staying within clear sight. They're not to the point where he's standing there like

this, so that you can see that he's not doing anything with them. But he's just like standing around doing this. And that's the scary part because very quickly we had scenarios in the Academy where one of the instructors stood there, turned around like this, came out with a gun and fired so quickly that I didn't even have a chance to put my hand on my gun to take it out. And that's where you realize that so quick someone can come out with a weapon if you don't get them under control or get them to stop moving so that you can watch what they're doing. You can be killed, or you can be shot. And that's the part where I mean it was real scary because he wouldn't stop moving.'

"That was the reaction of a reasonable officer who, presumably, acted appropriately throughout the entire encounter: 'You can be killed or you can be shot ... [I]t was real scary because he wouldn't stop moving.' Police officers are thrown into combat-like situations where incredible coolness is called for. It is one thing to say that occasionally a nervous instinct falls short of the ideal. It is quite another thing to say that such a lapse is criminal, calling for imprisonment in a penitentiary." *Id.* at 650–652, 632 A.2d 163.

The court further explained:

"But for the fact that the gun went off (and that was found to have been an unintended accident), there was nothing unusual in the conduct of Officer Albrecht in making this felony stop involving a vehicle and multiple suspects. There is not a scintilla of evidence to suggest any deviation or departure, let alone a gross deviation or gross departure, from the standard of conduct regularly employed by the Montgomery County Police Department in making felony stops involving vehicles and/or multiple suspects. In terms of involuntary manslaughter of the gross criminal negligence variety, there is no evidence that Officer Albrecht's conduct was even unjustified, let alone conduct evidencing a reckless and wanton disregard of human life. There was no evidence to suggest that it was that which

Judge Orth stated, in *State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674 (1990), could be characterized as 'conduct that is of extraordinary or outrageous character.'

"Officer Albrecht fully articulated what it was that caused him to unlimber, 'rack,' [sic] and aim his shotgun. Virtually every officer who testified stated that he or she would have done the same thing in the same situation. Officer Albrecht was in the course of making a felony stop. The standard of conduct indisputably established by the evidence was that in the course of a felony stop it is reasonable to 'rack' and aim a shotgun if either of two additional conditions are present. One of those conditions is that a vehicle is involved in the felony stop. The other condition is that the felony stop involves two or more suspects. In this case, both conditions were satisfied.

"Darnell Budd, Rebecca Garnett, and James Littlejohn were all suspects. It was Rebecca Garnett who had driven two or three males away from the stabbing scene. In view of the tight time sequence, there was every reason for an arresting officer to believe that both Darnell Budd and James Littlejohn were two of the males driven from the stabbing scene. As Officer Albrecht approached Larchmont Terrace, both Darnell Budd and Rebecca Garnett were observed by him to be returning rapidly to the green Chevrolet automobile as they observed his approach." *Id.* at 672–673, 632 A.2d 163.

The Court of Special Appeals properly noted that gross criminal negligence in Rebecca's death cannot be predicated on a coincidental endangerment of bystanders which it said was the mere consequence of Albrecht's conduct, *vis-a-vis* the suspects and not *vice versa.* It said that the possible endangerment of bystanders was the effect of the confrontation of the suspects and not a contributing cause. *Id.* at 677, 632 A.2d 163. As to this, the court emphasized that the involuntary manslaughter charge must be premised on the reckless and wanton disregard of Rebecca's life directly and not to any consequential indifference exhibited toward bystanders. *Id.*

Dwelling further on the evidentiary circumstances underlying this tragic episode, Judge Moylan writes:

"The trial judge can hardly have been suggesting that, after Darnell Budd was observed leaving the scene wherein he had stabbed Timothy Fair, it was inappropriate for Officer Albrecht and Officer Thomas to pursue the green Chevrolet and to arrest Budd. Budd had left in a car with several other individuals. The officers had been told, at the stabbing scene, that Budd and several of the males who had been with him were drug dealers. They had been told, moreover, that one or more of the fleeing group might have a gun. When the car was discovered shortly thereafter by Officer Albrecht and the suspects, who had just been in that car, were numbered at three, it cannot be suggested that this was not one of those 'felony stops,' involving either a vehicle *or* multiple suspects, described by the Montgomery County Police Department as one where officers should approach with guns drawn.

"Although the trial judge demeaned the significance of the earlier stabbing as he used the phrase 'given the relative lack of severity of the crime' and demeaned the potential danger posed by Darnell Budd as 'a felon, not the most fearsome type,' a stabbing of a victim in the back with a glass bottle is no less serious than a stabbing with a knife. The pictures introduced at trial showed the gaping wound that had been inflicted on the back of Timothy Fair. The wound had been observed by Officer Albrecht and Officer Thomas. In the photograph, it is three to four inches in length and is gaping open to the width of an inch or more. It was no mere incident of some 'school boy scuffle.'

"The trial judge also spoke of 'the lack of threats posed by the suspects.' When Officer Albrecht and Officer Thomas took off in pursuit of those suspects, they had been told that the two or three males in the group were drug dealers and that the group might be carrying guns. Neither Budd nor others with him could, except through hindsight, be lightly dismissed as 'not the most fearsome type.' In approaching a felony stop rife with that potential, that fear is

not dissipated until the scene is neutralized and the hands of all suspects have been observed. The arresting officers 'get the drop on' the suspects first and only lower their weapons after they are reassured that the suspects pose no danger. When Officer Albrecht saw no weapons in the hands of Rebecca Garnett, he 'checked her off' in his mind and was about to direct his attention to Darnell Budd and James Littlejohn when his shotgun accidentally discharged. The larger danger had not yet dissipated. Both Officer Albrecht and Officer Thomas were concerned about the hands of Darnell Budd. Officer Albrecht described Budd as 'manipulating' his shirt and preventing Officer Albrecht from getting an unimpeded view of Budd's hands. Viewing events, as we must, from the perspective of the officers on the scene, Darnell Budd cannot, as of the moment of the encounter, be lightly dismissed as 'not the most fearsome type.'

"What is nowhere mentioned in the fact finding of the court is that James Littlejohn posed the most serious danger of all three suspects. The trial judge had earlier admonished that 'in evaluating the reasonableness' of Officer Albrecht's conduct, 'his actions must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.' 'With 20/20 vision of hindsight,' we now know that Littlejohn was an unarmed blind man and posed no danger at all. The officers, however, did not know that as they approached the scene. Officer Thomas knew Littlejohn by sight but acknowledged that, as he approached the scene, he did not know who that third figure in the back seat of the green Chevrolet was. Littlejohn, as that third figure, was shielded behind the front seat. His hands were completely out of the view of both officers. 'From the perspective of a reasonable officer on the scene,' Littlejohn was most definitely a suspect and posed a clear threat to the officers." *Id.* at 678–680, 632 A.2d 163.

As to the State's reliance upon Albrecht's customizing his shotgun to prove gross criminal negligence, the intermediate appellate court held that evidence of this fact, i.e., the use of

the bandolier or sling, was not a legally sufficient predicate upon which to find gross criminal negligence. *Id.* at 681, 632 A.2d 163. Explaining, the court observed:

"There was no evidence to the effect that Officer Albrecht's fitting of a bandolier on his shotgun was either 'highly questionable' or 'potentially dangerous.' The bandolier carried fifteen rounds of ammunition. When fully loaded, the bandolier and the ammunition weighed a total of 2.39 pounds. Two experts testified with respect to the possible physical repercussions of the added weight on the firing of the weapon. Neither of the experts had any knowledge as to the policy of the Montgomery County Police Department with respect to such a bandolier." *Id.*

Although somewhat repetitious, the concluding portion of Judge Moylan's opinion for the Court of Special Appeals bears repeating:

"... If we pay more than lip service to the principle of law that Officer Albrecht should not be judged on the basis of the harm that resulted from his conduct but only on the basis of the antecedent conduct itself, he exhibited no reckless and wanton disregard of human life. He was involved, indisputably, in a felony stop of a vehicle involving multiple suspects. A stabbing had occurred and at least one of the stabbers, if not more, was believed to have left the scene in the car driven by Rebecca Garnett. There were indications that the group leaving in that car were drug pushers who might well be armed. However innocent Rebecca Garnett may have turned out to be in hindsight, she was definitely a suspect when Officer Albrecht first approached her. According to standard procedure, you do not aim a shotgun at a suspect only after you perceive that the suspect *is* armed. That may be too late. It is rather the case that you aim a shotgun at a suspect immediately and keep it aimed until you are satisfied that the suspect *is not* armed.

"If aiming a shotgun at a suspect in the course of a felony stop of multiple suspects is a reckless or wanton disregard of human life or a gross deviation from standard police

procedure, then that is what the Montgomery County Training Academy teaches. We do not believe that to be the case. If pointing a shotgun at a suspect under those circumstances is a reckless and wanton disregard of human life, then that is what Officer Albrecht's fellow officer, Officer Thomas, also was in the process of exhibiting on the day of this confrontation and that is what three of Officer Albrecht's fellow officers and classmates—Donna Howard, Joyce Barrow, and Harold Burch—exhibited on no less than thirty other occasions. We do not believe that to be the case.

"Save only for the accidental discharge of the weapon, Officer Albrecht's conduct was no different from that, actual or hypothesized, of any of the other officers, with the single exception of Sergeant Muehlenhort. Neither did it deviate, let alone grossly deviate, from what he had been taught to do at the Police Training Academy. The norm, in terms of police response to a felony stop involving a vehicle and/or multiple suspects, is not what judges might wish it to be but what the evidence shows it to be. In terms of the evidence in this case, Officer Albrecht's conduct in aiming his weapon was the norm and not a departure, let alone a gross departure, therefrom.

"We hold that, given the factual finding that Officer Albrecht did not fire the shotgun intentionally, the remaining evidence was not legally sufficient to support a finding of gross criminal negligence, to wit, evidence that he was acting without justification and in such a way as to exhibit a reckless and wanton disregard for human life. Neither was the remaining evidence, once any fact finding that the gun had been fired intentionally was rejected, legally sufficient to support a verdict that Officer Albrecht was guilty of misconduct so reckless as to constitute a gross departure from the standard of conduct that a reasonable police officer would observe. We hold, therefore, that the verdicts of guilty of involuntary manslaughter and of reckless endangerment, necessarily predicated on such states of mind, were clearly erroneous." *Id.* at 687–688, 632 A.2d 163.

Being in full accord with the opinion of the intermediate appellate court, I respectfully dissent.