704 A.2d 511

**David Allen ELMER**

v.

**STATE of Maryland.**

**No. 636, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Jan. 13, 1998.

John L. Calhoun, Assigned Public Defender, Baltimore, for Appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and John L. Scarborough, State's Atty. for Cecil County, Elkton, on the brief), for Appellee.

Argued before MURPHY, C.J., and THIEME, J., and JOHN F. McAULIFFE, Judge (retired), Specially Assigned.

THIEME, Judge.

Appellant David Allen Elmer and co-defendant Robert Keith Brown were tried before a jury, presided over by Judge Edward D.E. Rollins, Jr., in the Circuit Court for Cecil County on ten charges stemming from a single shotgun blast fired from a car in which appellant was the passenger and Brown was the driver. Motions for judgments of acquittal were granted with respect to five of the charges at the close of the State's case, and the jury returned guilty verdicts on the remaining five charges.[1] The judge granted appellant's motion for a new trial with respect to the charge of shooting with the intent to maim and then sentenced him on the four remaining convictions: malicious injury to an eye (fifteen years, ten of them suspended), assault (ten years concurrent and suspended), reckless endangerment (five years concurrent and suspended), and conspiracy to shoot with intent to disable (ten years concurrent and suspended). His appeal presents the following issues:

    I.    Whether the Court erred in allowing cross-examination of the co-defendant based on the plea negotiation proffer of his counsel.

---

1. Brown has appealed his convictions to this Court in the pending case of *Brown v. State,* No. 629, Sept. Term, 1997.

II.   Whether the evidence was insufficient to convict appellant.

For reasons to be set forth, we affirm.

The offending shotgun blast was the climax of an escalating altercation that took place on 1 February 1996. According to the testimony elicited at trial, appellant was the only passenger in a car driven by co-defendant Brown through the Winding Brook area of Cecil County. At one point, the car swerved somewhat close to a group of four persons. Those four then walked to a nearby basketball court and informed others of the swerving incident. The car carrying appellant and Brown soon approached the basketball court, and several of those present started throwing rocks at the car. Many of the rocks were quite large. The car again swerved toward some of the participants and then quickly departed. Evidence conflicted on whether appellant and Brown left the residential development and then returned or whether they were prevented from exiting by another car blocking the road. In any event, their car returned a third time, and several of the pedestrians were brandishing more rocks. A shotgun barrel emerged from the passenger window and discharged. The shot struck only one victim, a man who, by all accounts, was not theretofore involved in the incident. Three pellets struck him in his head, two more in his nose, and one in his left eye. The victim suffered irreparable damage to his eye and now wears a replacement prosthesis.

A major evidentiary conflict concerned whether the co-defendant/driver or appellant/passenger pulled the trigger. Many witnesses testified that the shotgun barrel emerged from the passenger side, and several of these witnesses testified that appellant was the one who fired the shot. A police detective testified that he found nine shotgun shells on appellant's person at the time of his arrest and that the shotgun was found in the shed of appellant's third cousin. There was other evidence, however, that appellant had an injured hand at the time, and two witnesses testified to having seen co-defendant Brown with a gun in his hand. Another detective placed into evidence a statement made by appellant during a

police interview in which he stated that he was not "the shooter."

Appellant himself did not take the stand. Brown did take the stand, however, and he confessed to firing the shot. He said that appellant had indeed pointed the barrel of the gun out of the window to scare the "attackers," but that appellant had dropped the gun when one of the rocks struck the car near him. Brown then admitted that he grabbed the gun, aimed it high in the air, and fired it out the passenger window. On cross-examination of Brown, the following exchange occurred:

Q. Mr. Brown, did you ever make the statement that when you came down around the curve ... your attention was drawn to the people that were running from your left, and that at that point in time Allen Elmer put that gun out the window, pulled the trigger, the gun boomed, and the first thing you said to him is what the F did you do? Did you ever make that statement?

MR. SMIGEL [counsel for co-defendant Brown]: Objection. May we approach the bench

. . .

THE COURT: What is your objection?

MR. SMIGEL: I am trying to make sure that [the prosecutor] is not trying to get into attorney/client privilege. The attorney who he was making the statement to—clarify that please.

THE COURT: Well, if he made it to you, how would he know about it? If he made it to you, how would [the prosecutor] know about it?

MR. STERN [counsel for appellant]: I object. Objection.

MR. SMIGEL: My objection is I want him to clarify who he made the statement to.

MR. PARRACK [prosecutor]: All I have to ask him is if he ever made the statement.

THE COURT: You're overruled.

The prosecutor then began to repeat the question substantially verbatim, and Brown's counsel interrupted with another objection. The court permitted a second sidebar.

MR. SMIGEL: Your Honor, Mr. Parrack asked on settlement negotiations what would my client testify to, and during settlement negotiations I told him what my client would testify to. I never told him my client said that. That was part of the settlement negotiations for—

MR. STERN: In all fairness, good conscience, fairness, he can't use something like that now when negotiations—

THE COURT: Is this what you are using now?

MR. PARRACK: Yes, I am. Let me tell you how this went through. This is—Mr. Smigel came to me, and said his client was willing to plead guilty to reckless endangerment, and his client wanted to testify in my prosecution of this defendant; and his client would testify just exactly the same that I am asking right now.

MR. SMIGEL: No. What I said—he asked, what do you expect your client to say. I said, I would expect my client to testify—

MR. PARRACK: And he continually said that's what the witness had said.

MR. SMIGEL: I never intentionally asked my client what he did or not what he did until ten minutes before yesterday.

THE COURT: What you—

MR. SMIGEL: He asked what I expect him to testify to. I never—

THE COURT: You are overruled. You have your objection.

Thereupon, the prosecutor asked the question a third time, this time beginning, "Mr. Brown, you made the statement, didn't you ..." The rest of the question was substantially identical, but it concluded with the added detail "and Mr. Elmer said to you, 'I shot the car.' Didn't you make that statement?" Brown finally answered the question:

A. No, I did not make that statement. That was how it was stated in newspapers and stuff; and at that time no one had given me a chance to tell my side of the story, what happened down there that day. I was never given a chance to explain what happened or anything like that. And in my charging documents that was what had been said. So that is what I had went along with to try to get those charges filed against the attackers who admitted to attacking, which you have let go; and that's so they can get away with attacking people. That's—I mean, I know it is a terrible shame that somebody got hurt in this incident. That could have easily been me and Allen on that stretcher flying to shock trauma. Does that give them the right to attack us?

Q. Mr. Brown, didn't you say that you would testify to just that in the prosecution of Mr. Elmer?

A. No, I did not. That was never said, no. I never said I was going to testify. I am saying that now here. I am right now setting here finally—finally after a year and six months in jail, free of all this terror and nervousness and pain and everything that me and my family has had to suffer. I'm here now finally getting to tell the truth, and what really happened in this case.

Q. Did you ever communicate to me that you were going to testify, or you'd be willing to testify in the prosecution of Mr. Elmer?

MR. STERN: Objection.

MR. SMIGEL: Objection.

THE COURT: Sustained.

Mr. Stern then approached the bench to renew his objection to the prosecutor's questioning on the basis of statements made in Brown's plea negotiations. The court assured Mr. Stern, "You got [your objection] for the record the first time. You have it on the record, gentlemen."

### Rule 5–410(a)(4)

Appellant first argues that the court committed reversible error by allowing the prosecutor to cross-examine Brown on statements made in the course of plea negotiations, in violation of Maryland Rule 5–410(a)(4). The appellant asserts he was improperly prejudiced by the aspersions cast on the only eyewitness who testified that appellant was not the shooter, potentially leading the jury to find that appellant was the shooter. Appellant further argues that the public policy favoring the exclusion of statements made in plea negotiations warrants reversal. The State responds (1) that Rule 5–410 is of no avail because no evidence of any such statement was ever introduced and (2) that the negative response given to the question renders harmless any possible error in asking it.

Maryland Rule 5–410(a) provides:

Except as otherwise provided in this Rule, evidence of the following is not admissible against the defendant who made the plea or was a participant in the plea discussions:

. . .

(4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or nolo contendere or which result in a plea of guilty or nolo contendere which was not accepted or was later withdrawn or vacated.

This rule was derived from Federal Rule of Evidence 410 and adopted by the Court of Appeals in 1993. Years prior to the adoption of the rule, the Court of Appeals expressed its agreement with the principle that statements made in the course of unsuccessful plea bargaining should not be introduced against a defendant at a later trial. *Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986). The *Wright* Court reasoned that such a rule would (1) facilitate the policy of encouraging plea bargaining and (2) effectuate the defendant's right subsequently to withdraw a guilty plea. 307 Md. at 586–87, 515 A.2d 1157.[2]

---

**2.** Interestingly, applying these principles to the facts of *Wright,* the Court declined to suppress the defendant's statements. Wright had

Rule 5–410(a)(4) affords appellant no relief because, as the State has correctly pointed out, the rule only bars the introduction of evidence and no evidence was introduced in the instant case regarding any plea bargaining statement. The prosecutor merely asked whether an inconsistent statement had been made, and Brown responded with a firm denial. No attempt was made to prove the hypothetical statement. The judge, therefore, did not commit error with regard to appellant under Rule 5–410 by allowing the question of Brown.

Appellant also asks us to reverse out of concern for the public policies behind the inadmissibility of statements made in plea negotiations, because the prosecutor was obviously cross-examining Brown based on information the prosecutor learned during Brown's plea negotiations. Appellant's argument for extending the effect of the rule calls upon this Court to reach two separate conclusions: (1) that it violated the policies of Rule 5–410(a)(4) for the prosecutor to use the statement made in plea discussions as the basis for cross-examination on a prior inconsistent statement, and (2) that it furthers these policies to extend the protection of the rule to appellant, who was not a party to the negotiations at issue. In considering these two requested extensions, we notice that we do not have the benefit of a single reported Maryland case interpreting the scope of Rule 5–410, nor one delineating the extent of the specific policies first identified in *Wright*.[3] We ascribe this lack of precedent to the relative clarity and simplicity of the rule, as well as to the high integrity of the

---

breached a plea agreement in which he had specifically agreed to the use of his statements in case of his breach. The Court reasoned, therefore, that effective plea bargaining would best be encouraged by holding Wright to his agreement and admitting his statements. 307 Md. at 586–87, 515 A.2d 1157.

3. In *Allgood v. State*, 309 Md. 58, 522 A.2d 917 (1987), the Court of Appeals did extend the doctrine in a different direction. In that case, the Court barred the introduction of inculpatory grand jury testimony given pursuant to a plea agreement, where it was the State that later repudiated the agreement, albeit justifiably. Unlike *Wright*, the agreement did not contain any specification that such statements could be introduced in case of a breach.

prosecutorial bar in general. The Reporter's Note to Rule 5–410 does not provide us with any guidance with regard to appellant's argument either.

At this juncture we decline appellant's first invitation to hold that the prosecutor's question violated the spirit of the rule. First, we note that it is still an open question whether Maryland's Rule 5–410 bars the State from introducing actual evidence of a prior statement made during plea negotiations once the defendant has taken the stand and testified in an inconsistent manner, although we are aware that the analogous federal rule has been so construed,[4] and the structure of the Maryland rule supports such a reading.[5] Appellant would have us decide against admission in such cases (even though his case raises no such issues), and then resolve the further question of whether the State may merely inquire into such a statement even without introducing evidence. This would be somewhat of a judicial stretch. Second, we are not entirely convinced that Rule 5–410 is even applicable to the instant statement because the rule on its face only applies to statements used *against* the declarant/defendant. Here, although the alleged prior statement was being used to impeach co-defendant Brown, the statement itself is essentially exculpatory (effectively, "He did it; not me.") and thus may not qualify as being used "against" Brown. Given that the twin purposes of Rule 5–410 are to encourage frank plea discussions and to facilitate withdrawal of guilty pleas, it is not immediately apparent how either policy would be served by applying the rule to purely exculpatory statements. Defendants generally require no encouragement to make such statements. If the

---

**4.** *United States v. Wood,* 879 F.2d 927, 936–37 (D.C.Cir.1989); *United States v. Lawson,* 683 F.2d 688, 690–93 (2d Cir.1982).

**5.** The substance of the rule is set forth in section (a), with two exceptions set forth in section (b). Only exception (b)(2) pertains to statements made in the course of plea discussions. That exception permits admission of such statements only as prior inconsistent statements and only in a subsequent *civil* proceeding. By negative implication, there would be no exception for use as a prior inconsistent statement in the original criminal proceeding.

statement at issue is not even covered by the rule, logically how can any particular use of the statement violate the policies behind the rule? Furthermore, none of these specific issues have been addressed or briefed by either party before us. We even have some questions concerning the appellant's standing to resolve them. We therefore decline to resolve this appeal on such bases.

We do conclude, however, that the policies underlying Rule 5–410 do not support extension of the rule's protective scope to include one who was not a party to the plea negotiations, such as appellant. To begin with, the rule itself plainly limits its application to "the defendant who made the plea or was a participant in the plea discussions." Such an explicit delineation indicates that the drafters specifically decided against applying the rule to any non-declarant. This reading finds further support in the notes of the Supreme Court Advisory Committee on analogous Federal Rule of Evidence 410, which employs the same phrase: "the defendant who made the plea or was a participant in the plea discussions." The Committee indicated:

> Limiting the exclusionary rule to use against the accused is consistent with the purpose of the rule, since the possibility of use for or against other persons will not impair the effectiveness of withdrawing pleas or the freedom of discussion which the rule is designed to foster.

While their reasoning is not binding upon us, we find it persuasive. It is difficult to imagine that a defendant would be discouraged from engaging in plea negotiations just because his or her statements may be detrimental to someone else's interests. Plea negotiations frequently involve offers to testify against others. Even acknowledging that extending the rule to cover non-declarants might produce some marginal additional encouragement of plea negotiations, it would not at all advance the complementary policy of facilitating the withdrawal of guilty pleas, and it would come at the too high price of excluding large amounts of otherwise reliable evidence. *See Whitaker v. Prince George's County*, 307 Md. 368, 383, 514

A.2d 4 (1986) (holding that the "additional marginal deterrence" of applying the Fourth Amendment exclusionary rule to civil trials "would not ... outweigh the cost to society in excluding what might concededly be relevant and reliable evidence"); *see also State v. Walker*, 345 Md. 293, 345, 691 A.2d 1341 (1997) ("[T]estimonial exclusionary rules and privileges contravene the fundamental principle that the public ... has a right to every man's evidence.") (quoting *Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980)) (internal quotation omitted). In sum, we find that the public policies of Rule 5–410(a)(4) would not be served by extending the scope of the rule to include appellant, and appellant's appeal based on the rule fails.

This is not to say that we have no misgivings about the propriety of the prosecutor's conduct in attempting to manufacture evidence by creating an impression in the minds of the jurors through questions that implied the existence of facts. Chief Judge Murphy of this Court has written:

> Do not confuse the absolute right to cross-examine with the less-than-absolute right to ask a specific question. Counsel does not, for example, have an unqualified right to ask questions which suggest the truth of something that is not true. The trial judge should prohibit questions which insinuate the truth of facts that counsel cannot prove.

Joseph F. Murphy, Jr., *Maryland Evidence Handbook*, § 1303 at 678 (2d ed.1993). If this admonition applies to all counsel, it applies with special urgency to prosecutors, who are endowed with public trust and who perform a special role in the criminal justice system. Maryland Rules of Professional Conduct Rule 3.8 cmt. ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."). As one expert on prosecutorial misconduct has indicated:

> By asking questions that have no basis in fact the prosecutor can leave in the minds of the jurors damaging and prejudicial but false and inadmissible ideas that cannot be adequately rebutted by the testimony of witnesses or instructions from the court.

Bennett L. Gershman, *Prosecutorial Misconduct*, § 9.4(a)
(1997). *See also* 6 Wigmore, *Evidence* § 1808(2) at 371–75
(Chadbourn rev.1976 and 1981 Supp.); *Marini v. State*, 30
Md.App. 19, 28–29, 351 A.2d 463 (1976) (the failure of the
State's Attorney to offer proof in support of a question to the
defendant implying he stole the license tags he claimed were
borrowed may be reversible error unless curative steps are
taken); *cf. Hagez v. State*, 110 Md.App. 194, 222, 676 A.2d
992 (1996) (calling a witness in order to ask leading questions
while knowing she will invoke, albeit improperly, the spousal
testimonial privilege constituted reversible error).

■■■■ The prosecutor here exhibited temerity in the face of
these principles by asking the question of Brown. He could
not prove that Brown made the statement alleged, and the
entire area of inquiry was infused with the client/attorney
privilege, the inadmissibility of plea bargaining discussions,
and perhaps even *Bruton* problems.[6] We assume in the
prosecutor's defense that Brown's confession on the stand
came as a surprise, since Brown's counsel had apparently
indicated to the prosecutor prior to trial that Brown would be
willing to testify in appellant's trial. Once Brown's counsel
explained at sidebar that his client had never made the
statement, however, the prosecutor had no business maintain-
ing this line of inquiry and should have withdrawn the ques-
tion. By repeating the question in verbatim detail, even down
to editing out the "F" word for the benefit of propriety, the
prosecutor only exacerbated the potential for the question to
mislead the jury into treating the question itself as actual
evidence. In posing the question a third time, he asked
whether Brown, a co-defendant, had said he would testify
against appellant, which placed before the jury the additional
inference that Brown had engaged in plea negotiations. In-
forming the jury that a defendant has engaged in plea negotia-
tions can be inherently prejudicial because it tends to demon-

---

6. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d
476 (1968) (ruling that the use of one defendant's confession against
another co-defendant violates the co-defendant's right of confrontation).

strate that the defendant at one point contemplated a guilty plea. When the prosecutor asked his fourth and final question (which went unanswered), he even went so far as to ask, "Did you ever *communicate to me* that you were going to testify...." This gave the jury the clear impression that the prosecutor's entire line of questions regarding Brown's prior inconsistent statement was based on personal knowledge and derived from Brown himself. Not only did the prosecutor have no ability to prove this, it was actually known by him to be false. Attempting to give the jury a knowingly false impression presses the limits of judicial tolerance.

In spite of all our concerns regarding the propriety of the prosecutor's conduct, the appellant has based his appeal entirely upon Rule 5–410(a)(4) and its policies, and Brown's case must be addressed separately. We find no error with regard to appellant arising out of Rule 5–410(a)(4) or its policies.

### Sufficiency of Evidence

Appellant's second assignment of error is that the evidence was insufficient to convict him on any of the four counts. The test of appellate review of evidentiary sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979)). We therefore do not weigh the evidence, but merely ask whether the evidence "supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Id.*

With regard to the crime of conspiracy to shoot with the intent to disable, the evidence supports the conviction. A criminal conspiracy consists of a combination of two or more persons who agree to achieve an unlawful purpose, or a lawful purpose by unlawful means. *Mason v. State,* 302 Md. 434, 444, 488 A.2d 955 (1985); *Acquah v. State,* 113 Md.App. 29, 43,

686 A.2d 690 (1996). The unlawful agreement need not be formalized; it is sufficient for the State to produce enough evidence for the finder of fact to infer a tacit agreement. *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988); *Acquah,* 113 Md.App. at 50, 686 A.2d 690. The evidence adduced at trial enabled a reasonable fact-finder to conclude that rocks were thrown at the car carrying appellant and Brown, that they left the development, retrieved a shotgun, and returned with the purpose of shooting someone in retaliation. Further concert of action between the defendants is shown by testimony that Brown picked up and fired the shotgun immediately after appellant dropped it. This is sufficient to prove the charged conspiracy.

With regard to the other three convictions, the evidence is sufficient to prove that appellant was an accomplice. Accomplice liability is established when the defendant has knowingly aided, commanded, counseled, or encouraged the actual perpetrator. *Pope v. State,* 284 Md. 309, 331, 396 A.2d 1054 (1979). Here, although it was Brown who pulled the trigger, there was evidence supporting a conclusion that appellant aided the performance of this act. The jury could reasonably have determined that appellant was present with Brown at all relevant times, that he carried the shotgun shells, and that he initially pointed the shotgun out of the window of the car before he dropped the gun and Brown picked it up. This evidence supports accomplice liability for the crimes of malicious injury to an eye, assault, and reckless endangerment. Additionally, the mere fact that appellant pointed a loaded shotgun out of the window of the car at other persons is by itself sufficient to support a conviction of reckless endangerment. *State v. Albrecht,* 336 Md. at 500–01, 649 A.2d 336; *see also Boyer v. State,* 107 Md.App. 32, 41–42, 666 A.2d 1269 (1995) (reckless endangerment is supported where the defendant's hand was six inches away from a loaded machine gun he placed under a bedsheet with the safety off and pointed at a police officer and the defendant's own daughter, even absent any intent to harm either). Accordingly, we affirm.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.