724 A.2d 625

David Allen **ELMER**

v.

**STATE of Maryland.**

**No. 31, Sept. Term, 1998.**

Court of Appeals of Maryland.

Feb. 18, 1999.

2

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER, and CATHELL, JJ.

RAKER, Judge.

Petitioner was convicted by a jury in the Circuit Court for Cecil County of the offenses of unlawful shooting with intent to disable, in violation of Maryland Code (1957, 1992 Repl. Vol.), Article 27, § 386; malicious injury to eye, in violation of Art. 27, § 385; common law assault; reckless endangerment, in violation of Art. 27, § 120; and common law conspiracy to

**4**

shoot with intent to disable.[1] The Court of Special Appeals affirmed. *Elmer v. State,* 119 Md.App. 205, 704 A.2d 511 (1998). This Court granted certiorari to answer the question of whether the Court of Special Appeals erred in affirming the judgments despite the error of the trial court in permitting the State to cross-examine the co-defendant Robert Brown with statements made by Brown's counsel during plea negotiations which directly incriminated Petitioner.

## I.

On February 1, 1996, Petitioner David Allen Elmer was a passenger in a car driven by Robert Brown. The car entered the neighborhood of Winding Brook and swerved toward four pedestrians standing close to a bridge near the side of the road. The four people then walked to a nearby basketball court and told others of the swerving incident. The Brown car drove to the basketball court, which is when several of the people started throwing large rocks at the car, causing damage to the windshield, windows, and body of the car. The car again swerved toward some of the participants and then quickly departed, returning a third time, to find several of the pedestrians brandishing more rocks.

Rocks began bouncing off the car again, and Petitioner put a shotgun outside the passenger window. A shot was fired, and the shot struck Robert Earl, a bystander uninvolved in the rock throwing incident. Three pellets struck him in his head, two more in his nose, and one in his left eye. The victim suffered irreparable damage to his eye and now wears a replacement prosthesis.

In a joint trial, Brown and Elmer proceeded to trial before a jury. A significant issue developed at trial as to which person

---

**1.** Unless otherwise indicated, all statutory references herein shall be to Maryland Code (1957, 1992 Repl. Vol.), Article 27. Article 27, § 386 was repealed by Acts of 1996, ch. 632, § 1, effective October 1, 1996. Article 27, § 385 was repealed by Acts of 1996, ch. 632, § 1, effective October 1, 1996. Article 27, § 120 was repealed by Acts of 1996, ch. 632, effective October 1, 1996. Petitioner was granted a new trial for unlawful shooting with intent to disable.

in the car actually fired the shotgun—Brown or Elmer. El-
mer did not testify. Several witnesses testified that they saw
the shotgun through the passenger's side and that Elmer fired
the shot that struck Mr. Earl. Brown testified that he
reached over and pulled the trigger as one of the bystanders
was aiming a large chunk of granite at the car window and
that Elmer was trying to avoid being hit with it. Brown's
testimony that he pulled the trigger, and not Elmer, led the
prosecutor to inquire of Brown on cross-examination:

> THE STATE: Mr. Brown, did you ever make the statement
> that when you came down around the curve ... your
> attention was drawn to the people that were running from
> your left, and that at that point in time Allen Elmer put that
> gun out the window, pulled the trigger, the gun boomed,
> and the first thing you said to him is what the F did you do?
> Did you ever make that statement?
>
> [COUNSEL FOR BROWN]: Objection. May we approach
> the bench?
>
> THE STATE: Did you ever make that statement, Mr.
> Brown?
>
> [COUNSEL FOR BROWN]: Your Honor—
>
> THE COURT: It's cross-examination.
>
> THE STATE: Did you ever make that statement?
>
> [COUNSEL FOR BROWN]: Your Honor—
>
> THE COURT: Just a minute. Come on up.

The following discussion took place at the bench.

> THE COURT: What is your objection?
>
> [COUNSEL FOR BROWN]: I am trying to make sure that
> [the prosecutor] is not trying to get into attorney/client
> privilege. The attorney who he was making the statement
> to—clarify that, please.
>
> THE COURT: Well, if he made it to you, how would he
> know about it? If he made it to you, how would [the
> prosecutor] know about it?
>
> [COUNSEL FOR ELMER]: I object. Objection.

[COUNSEL FOR BROWN]: My objection is I want him to clarify who he made the statement to.

THE STATE: All I have to ask him is if he ever made that statement.

THE COURT: You're overruled.

The bench conference concluded and the prosecutor continued before the jury:

THE STATE: Mr. Brown, I think you heard the question, but I will ask you again. Did you ever make the statement, Mr. Brown, that—when you came down around this curve that your attention was drawn to the people who were coming from your left, and you're looking out there, out the driver's side toward those people on the left as you heard— don't look at [counsel for Brown].

[COUNSEL FOR BROWN]: I am making the objections. He is looking at me.

THE COURT: I am overruling you. You are looking at the attorney.

[COUNSEL FOR BROWN]: Your Honor, we need to approach the bench again.

THE COURT: No, no, you are not approaching the bench. He is asking questions. I've already ruled on this. Go ahead.

[COUNSEL FOR BROWN]: Your Honor, it's on a separate matter. I need to approach the bench for the record, please.

THE COURT: Come on up.

The following discussion took place at the bench.

[COUNSEL FOR BROWN]: Your Honor, [the prosecutor] asked in settlement negotiations what would my client testify to, and during settlement negotiations I told him what my client would testify to. I never told him my client said that. That was part of the settlement negotiations for—

[COUNSEL FOR ELMER]: In all fairness, good conscience, fairness, he can't use something like that now when negotiations—

THE COURT: Is that what you are using now?

THE STATE: Yes, I am. Let me tell you how this went though. This is—[counsel for Brown] came to me, and said his client was willing to plead guilty to reckless endangerment, and his client wanted to testify in my prosecution of this defendant; and his client would testify just exactly the same that I am asking right now.

[COUNSEL FOR BROWN]: No. When I said—he asked, what do you expect your client to say. I said, I would expect my client to testify—

THE STATE: And he continually said that's what the witness had said.

[COUNSEL FOR BROWN]: I never intentionally asked my client what he did or not what he did until ten minutes before yesterday.

THE COURT: What you—

[COUNSEL FOR BROWN]: He asked what I expect him to testify to. I never—

THE COURT: You are overruled. You have your objection.

[COUNSEL FOR BROWN]: Thank you.

Before the jury, the prosecutor again inquired:

THE STATE: Mr. Brown, you made the statement, didn't you, that when you came around this curve on Willow Drive that your attention was drawn to the people over on your left hand side, and that you were driving, and you are watching them when you heard the boom of a shotgun; and you looked over at Mr. Elmer and said, what the F did you do that for; and Mr. Elmer said to you, I shot the car. Didn't you make that statement?

BROWN: No, I did not make that statement. That was how it was stated in newspapers and stuff; and at that time no one had given me a chance to tell my side of the story, what happened down there that day. I was never given a chance to explain what happened or anything like that. And in my charging documents that was what had been

said. So that is what I had went along with to try to get those charges filed against the attackers who admitted to attacking, which you have let go; and that's so they can get away with attacking people. That's—I mean, I know it is a terrible shame that somebody got hurt in this incident. That could have easily been me and Allen on that stretcher flying to Shock Trauma. Does that give them the right to attack us?

THE STATE: Mr. Brown, didn't you say that you would testify to just that in the prosecution of Mr. Elmer?

BROWN: No, I did not. That was never said, no. I never said I was going to testify. I am saying that now here. I am right now sitting here finally—finally after a year and six months in jail, free of all this terror and nervousness and pain and everything that me and my family has had to suffer. I'm here now finally getting to tell the truth, and what really happened in this case.

THE STATE: Did you ever communicate to me that you were going to testify, or you'd be willing to testify in the prosecution of Mr. Elmer?

[COUNSEL FOR ELMER]: Objection.

[COUNSEL FOR BROWN]: Objection.

THE COURT: Sustained. It's already been asked and answered.

Counsel again approached the bench and the following collo-quy occurred:

[COUNSEL FOR ELMER]: I want to formally object for the record that Your Honor permitted the state's attorney to ask questions about plea negotiations, or questions after it was plea negotiations, preliminary.

THE COURT: This was already objected to.

[COUNSEL FOR ELMER]: But you permitted him to continue. That's totally wrong for a state's attorney—

THE COURT: You've already got your objection. What are you bringing it up again for?

[COUNSEL FOR ELMER]: Because we—for the record.

THE COURT: You got it for the record the first time. You have it on the record, gentlemen.

Elmer filed a timely appeal to the Court of Special Appeals. The intermediate court affirmed, noting that Elmer based his entire appeal on a violation of Maryland Rule 5–410. *Elmer*, 119 Md.App. at 219, 704 A.2d at 517.[2] The court held that Rule 5–410 "bars the introduction of evidence and no evidence was introduced in the instant case regarding any plea bargaining statement." *Id.* at 214, 704 A.2d at 515. The court further held that Rule 5–410 applies only to one who is a party to the plea negotiations. *Id.* at 216, 704 A.2d at 516. Because Brown or his counsel, and not Elmer, participated in plea discussions, Elmer could not complain that the rule was violated and that any statements made by Brown were inadmissible as to him. *Id.* at 216, 704 A.2d at 516. We granted Elmer's petition for writ of certiorari.

## II.

Petitioner argues that the statements of Brown or Brown's lawyer were inadmissible against him because the statements violated the rules against hearsay and the confrontation clauses of the Sixth Amendment and Article 21 of the Maryland Declaration of Rights. Petitioner maintains that as to Brown, Maryland Rule 5–410 excludes statements of both Brown and his lawyer made during plea negotiations. Petitioner contends that, despite Brown's denial of the statement at issue, Petitioner was prejudiced by the repeated asking of the question. Simply because Brown denied making the statements attributed to him by the prosecutor does not end the inquiry and the prosecutor, through his questioning of Brown, informed the jury that the statements had, in fact, been made.

---

**2.** On the preservation issue, Petitioner points out that he argued not only the flagrant violation of Rule 5–410, but also the fact that the statements were made by Brown's lawyer, not Brown, and that the improper and prejudicial nature of the prosecutor's questions was reversible error. At trial, Petitioner made a general objection and argued the prejudicial impact of the question before the Court of Special Appeals. Accordingly, we shall consider his argument.

The State counters that Elmer cannot complain that Brown's statements were offered to impeach Brown because Rule 5–410 applies only to the defendant who made the plea or was a participant in the plea discussions. In any case, no such evidence was admitted against Elmer because Brown denied making the statement that Brown pulled the trigger. The State's final position is in the nature of a harmless error argument—that since Brown denied the statement, Elmer was not unfairly prejudiced.

### III.

### A.

Maryland Rule 5–410 provides, in pertinent part, as follows:

(a) *Generally.* Except as otherwise provided in this Rule, evidence of the following is not admissible against the defendant who made the plea or was a participant in the plea discussions:

\*    \*    \*    \*    \*    \*

(4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or nolo contendere or which result in a plea of guilty or nolo contendere which was not accepted or was later withdrawn or vacated.

The plain language of the rule provides that statements made in the course of plea negotiations with an attorney for the State are inadmissible against the defendant who participated in those negotiations. Because Elmer did not participate in Brown's plea negotiations, the Rule does not proscribe the State's use of the statement as to Elmer.

Maryland Rule 5–410 was derived from Federal Rule of Evidence 410 (also known as Rule 11(e)(6) of the Rules of Criminal Procedure) and is virtually identical with its federal counterpart. Like the Maryland rule, the federal rule provides that statements made in the course of plea negotiations with a government attorney are inadmissible against a defendant who participated in those negotiations. Participation in

the negotiations is a requisite. *United States v. Testa,* 33 F.3d 747, 751 (7th Cir.1994).

■■■■ The purpose behind both rules is to encourage plea bargaining and the open and candid discussions between prosecuting authorities and defendants. As the Court of Special Appeals pointed out, this reasoning finds support in the Advisory Committee Note to Federal Rule of Evidence 410. *Elmer,* 119 Md.App. at 216, 704 A.2d at 516; *see Jackson v. State,* 340 Md. 705, 716, 668 A.2d 8, 13–14 (1995) (noting that when federal rule of evidence contains same language as Maryland rule of evidence, court may look to former when interpreting latter). The Advisory Committee Note indicates:

> Limiting the exclusionary rule to use against the accused is consistent with the purpose of the rule, since the possibility of use for or against other persons will not impair the effectiveness of withdrawing pleas or the freedom of discussion which the rule is designed to foster.

The purpose of the rule would not be furthered by extending its application to include defendants who were not a party to the plea negotiations.

### B.

■■■■ Our inquiry does not end, however, with the determination that the issue is not governed by Rule 5–410. The inapplicability of Rule 5–410 to Petitioner does not transform evidence inadmissible under Rule 5–410 against Brown and otherwise inadmissible against Petitioner into admissible evidence. The State does not argue that the questioning of Brown as to his statements to his lawyer or his lawyer's statements to the prosecutor were admissible as to Brown.[3] The evidence was likewise inadmissible against Elmer, albeit on different grounds. As to Elmer, the statement which the

---

**3.** The Court of Special Appeals reversed Brown's conviction in a separate appeal. *Brown v. State,* 120 Md.App. 743 (1998) (holding that appellant was entitled to a new trial because the State improperly cross-examined about statements he allegedly made during plea negotiations).

prosecutor attempted to elicit from Brown constituted inadmissible hearsay.

▇▇ Keeping in mind that the evidence which the prosecutor was attempting to elicit was inadmissible evidence as to both Elmer and Brown, we now turn to the conduct of the prosecutor during questioning. We must determine if the prosecutor's questions were improper, and if so, "we look at the remarks in the context of the entire record and determine whether the defendants were deprived of fair trials." *United States v. Robinson,* 8 F.3d 398, 415 (7th Cir.1993). Indeed, the Court of Special Appeals discussed the prosecutor's misconduct in repeatedly pursuing the line of inquiry.

The prosecutor here exhibited temerity in the face of these principles by asking the question of Brown. He could not prove that Brown made the statement alleged, and the entire area of inquiry was infused with the client/attorney privilege, the inadmissibility of plea bargaining discussions, and perhaps even *Bruton [v. U.S.,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)] problems. We assume in the prosecutor's defense that Brown's confession on the stand came as a surprise, since Brown's counsel had apparently indicated to the prosecutor prior to trial that Brown would be willing to testify in appellant's trial. Once Brown's counsel explained at sidebar that his client had never made the statement, however, the prosecutor had no business maintaining this line of inquiry and should have withdrawn the question. By repeating the question in verbatim detail, even down to editing out the "F" word for the benefit of propriety, the prosecutor only exacerbated the potential for the question to mislead the jury into treating the question itself as actual evidence. In posing the question a third time, he asked whether Brown, a co-defendant, had said he would testify against appellant, which placed before the jury the additional inference that Brown had engaged in plea negotiations.... When the prosecutor asked his fourth and final question (which went unanswered), he even went so far as to ask, 'Did you ever *communicate to me* that you were going to testify....' This gave the jury the clear impres-

sion that the prosecutor's entire line of questions regarding Brown's prior inconsistent statement was based on personal knowledge and derived from Brown himself.  Not only did the prosecutor have no ability to prove this, it was actually known by him to be false.  Attempting to give the jury a knowingly false impression presses the limits of judicial tolerance.

*Elmer,* 119 Md.App. at 218–19, 704 A.2d at 517 (footnote omitted).

■ It is misconduct for a lawyer to inject inadmissible matters before a jury by asking a question that suggests its own otherwise inadmissible answer, "hoping that the jury will draw the intended meaning from the question itself...." C. WOLFRAM, MODERN LEGAL ETHICS, § 12.1.2, at 623 (1986).  As to prosecutors, a prosecutor may not ask a question "which implies a factual predicate which the examiner knows he cannot support by evidence...." *United States v. Elizondo,* 920 F.2d 1308, 1313 (7th Cir.1990) (quoting *United States v. Harris,* 542 F.2d 1283, 1307 (7th Cir.1976)); *United States v. Meeker,* 558 F.2d 387, 389 (7th Cir.1977); *see also,* NATIONAL PROSECUTION STANDARDS § 77.2, at 211 (2d. ed. 1991) (hereinafter PROSECUTION STANDARDS) ("Counsel should not ask a question which implies the existence of a factual predicate which he knows to be untrue or has no reasonable objective basis for believing is true."); AMERICAN BAR ASSOCIATION STANDARDS FOR CRIMINAL JUSTICE, PROSECUTION FUNCTION, Standard 3–5.7(d), at 103 (3d. ed. 1993) (hereinafter ABA STANDARDS) ("A prosecutor should not ask a question which implies the existence of a factual predicate for which a good faith belief is lacking.").[4]

---

4.  The issue arises as to when the State has a duty to introduce the factual predicate for a potentially prejudicial question posed on cross-examination.  Some cases have noted that although the government does not have a duty in *every* case to introduce such evidence, when the prosecution "asks damning questions that go to a central issue in the case, these questions must be supported by evidence available or inferable from the trial record." *United States v. Elizondo,* 920 F.2d 1308, 1313 (7th Cir.1990) (citation omitted).  When the factual predicate is based upon testimony which can only be supplied by the

"A lawyer who has no reason to believe that a matter is subject to proof may not, by pursuing the matter in examining a witness . . . attempt to create the impression that the matter is factual." WOLFRAM, *supra*, § 12.1.2, at 623. The problem is that whether the question is answered or not, the jury has been alerted to the fact which the question assumes. *Id.*

In *United States v. Meeker*, 558 F.2d 387 (7th Cir.1977), the prosecutor asked witnesses four improper questions. The first question alluded to matters that the prosecutor had no reason to believe would be supported by admissible evidence, the second question left the jury with a false impression of defendant's prior criminal activity, the third question contained "an implication that the defendant was guilty of engaging in the conduct for which he was on trial," and the final question asked for inadmissible opinion evidence which was irrelevant to the case. *Id.* at 388–89. The court reversed, stating:

> [T]he questions invited the jury to convict [the defendant] on facts outside the record, some of which were patently untrue, and others of which were not admissible at trial.
>
> 'The prejudice to a defendant of inviting conviction on facts—if they be such—dehors the record is counter to the basic concept of fairness.'
>
> . . . [C]oming from the mouth of the representative of the United States, of whom the average jury expects fairness and impartiality . . ., such prejudicial questions 'carry much weight against the accused when they should properly carry none.'

*Id.* at 390 (citations omitted).

█ This is exactly what happened in this case. As we have noted, the prosecutor's questions suggested the existence of facts which he could not prove, and indeed, after the bench conference, he *knew* he could not prove. Following the bench conference where defense counsel articulated the source of the

prosecutor alone, other significant issues arise. *See generally,* Annot., *Prosecuting Attorney as Witness,* 54 A.L.R.3d 100 (1973 & 1995 Supp.).

information, the prosecutor lacked a good faith belief in the factual predicate implied in the question.

■ In addition to conveying the impression to the jury that he had superior information of facts not in evidence before the jury, the prosecutor's questions were improper because they implied his personal opinion concerning Brown's truthfulness. A prosecutor may not express or imply his or her personal opinion concerning a witness's truthfulness. *Robinson,* 8 F.3d at 415; *see also United States v. Hartmann,* 958 F.2d 774, 786 (7th Cir.1992). Because the prosecutor's inquiry was highly prejudicial and inadmissible as to both Brown and Petitioner, the trial court should have precluded the inquiry.

## C.

We now turn to the State's contention that notwithstanding the improper inquiry, Petitioner was not prejudiced and thus, the error was harmless. The State argues that Petitioner was not prejudiced because Brown denied making the statement and also provided a detailed and plausible explanation for the origin of the statement.

■ It would be folly to suggest that questions alone cannot impeach. This notion was well-stated by then Chief Judge Wilner, now a member of this Court, writing for the intermediate appellate court in *Craig v. State,* 76 Md.App. 250, 292, 544 A.2d 784, 805, (1988), *rev'd on other grounds,* 316 Md. 551, 560 A.2d 1120 (1989), *jdgmt. vacated on other grounds,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990):

Questions alone *can* impeach. Apart from their mere wording, through voice inflections and other mannerisms of the examiner—things that cannot be discerned from the printed record—they can insinuate; they can suggest; they can accuse; they can create an aura in the courtroom that the trial judge can sense but about which we could only speculate. The most persistent denials, even from articulate adult witnesses, may not suffice to overcome the suspicion they can engender. . . .

Other courts also have recognized that "[a]n improper incriminating question or series of questions may constitute reversible error in certain cases." *United States v. Arambula–Ruiz,* 987 F.2d 599, 606 (9th Cir.1993) (citing *Douglas v. Alabama,* 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965)). In *Douglas,* the defendant and an alleged accomplice were tried separately in state court for assault with intent to murder. *Id.* at 416, 85 S.Ct. at 1075. The state called the alleged accomplice as a state's witness, who repeatedly refused to testify on self-incrimination grounds. *Id.* at 416, 85 S.Ct. at 1075. The prosecutor read his alleged confession to him, asking him "Did you make that statement?" *Id.* at 416, 85 S.Ct. at 1075. The statement incriminated Douglas by naming him as the person who fired the shotgun blast which wounded the victim. *Id.* at 417, 85 S.Ct. at 1076. Although the alleged co-conspirator's refusals to answer were not technically testimony, the Supreme Court held that the questioning was reversible error because "the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that [the co-conspirator] in fact made the statement...." *Id.* at 419, 85 S.Ct. at 1077. *See* ABA STANDARD 3–5.8 commentary, at 107 ("Assertions of fact not proven amount to unsworn testimony of the advocate and are not subject to cross-examination.")

The attempted impeachment of Brown with his alleged prior inconsistent statement that Petitioner was the shooter necessarily increased the possibility that Petitioner might be convicted on the basis of this unsworn evidence. The repeated questions of the prosecutor, accompanied by the unavoidable impression to the jury that Brown had made statements to the prosecutor that Elmer was the shooter, cannot be considered harmless error.

IV.

Petitioner challenges the sufficiency of the evidence, claiming that he lacked the specific intent to commit the crimes of conspiracy to shoot with intent to disable and malicious injury to eye. The test an appellate court applies in

assessing the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, "the verdicts were supported with sufficient evidence—that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *State v. Albrecht*, 336 Md. 475, 479, 649 A.2d 336, 337 (1994); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Upon our independent review of the record, we conclude that the evidence was sufficient to support the verdict. Several witnesses testified that Brown and Elmer had left the development after the initial rock-throwing incident. Witnesses also testified that after returning to the development, Elmer pointed a shotgun out of the window of the car. The jury rationally could have inferred that Brown and Elmer left the development to retrieve this shotgun. Several witnesses testified that Elmer fired the shotgun; he also had nine shotgun shells in his pockets when he was arrested. There was sufficient evidence for the jury to infer that Brown and Elmer left the development to retrieve a shotgun, and that Elmer fired the shotgun in retaliation for the earlier rock-throwing incident.

Assuming that the jury believed that Brown, and not Elmer, was the shooter, there was sufficient evidence for a rational jury to infer that Elmer was at least an aider and abettor to the shooting. The jury could have inferred that Elmer was actively involved in a plan to retrieve a shotgun, return to the development, and retaliate against the rock-throwers. Accordingly, we shall reverse the judgment and remand for a new trial.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY, AND REMAND CASE TO THAT COURT FOR NEW TRIAL. COSTS IN*

*THIS COURT AND IN THE COURT OF SPECIAL AP-
PEALS TO BE PAID BY CECIL COUNTY.*

Concurring & Dissenting Opinion by CHASANOW, J., in
which RODOWSKY, J., joins.

CHASANOW, Judge, concurring and dissenting.

I concur with the Court's holding that Maryland Rule 5–410
was not violated in the instant case, but I dissent from the
reversal of Elmer's conviction for three reasons. First, the
majority reaches out to reverse on an issue not properly
before the Court and not decided by the Court of Special
Appeals in its review of the instant conviction. The intermedi-
ate appellate court refused to decide the issue upon which this
Court reverses because that issue was not raised on appeal,
and Elmer's petition for certiorari does not challenge the
intermediate appellate court's decision that the issue was not
properly preserved for appeal. Second, the Court reverses a
conviction, not because there was any improperly admitted
testimony, but solely because of questions asked by the prose-
cutor. Third, when the witness denied making any prior
inconsistent statement, the witness's denial of the statement
apparently satisfied trial counsel, and there was no request for
a curative instruction and no request for a mistrial. If counsel
believed that *mere questions* alone constituted incurable prej-
udicial error, then it ought to be incumbent on counsel to
request a mistrial, not to wait to see if the verdict is unfavora-
ble.

## THE ISSUE BEFORE THIS COURT

We must keep in mind that co-defendant Brown's conviction
was reversed because Brown was cross-examined about state-
ments his attorney made to the State's Attorney during plea
bargaining discussions in violation of Md. Rule 5–410. The
Court of Special Appeals held, and this Court agrees, that
Petitioner Elmer is not entitled to have his conviction reversed
on this ground. Elmer's case must be viewed separately from
Brown's case. Brown was, in effect, testifying as a defense

witness for Elmer because his testimony inculpated himself and exculpated Elmer. Even though the physical evidence and the witness testimony was consistent with the passenger, Elmer, being the person who fired the shotgun, Brown took the stand and testified that it was he, and not Elmer, who fired the gun. That testimony exculpating Elmer was what triggered the cross-examination at issue. The majority decides that a witness, not called by the State, who testifies that he, not the defendant, fired the shots, cannot be cross-examined by the State as to whether he made any prior inconsistent statements, even though the prosecutor was told by the witness's attorney that the witness would testify that the defendant fired the shots.

The only evidentiary issue presented to and decided by the Court of Special Appeals in the instant case was whether Elmer could object because the prosecutor's questioning of Brown violated the Maryland rule prohibiting evidence of statements made during plea discussions. Md. Rule 5–410(a)(4).[1] The majority recognizes that the Court of Special Appeals held, "Elmer based his entire appeal on a violation of Maryland Rule 5–410." 353 Md. 1, 9, 724 A.2d 625, 628 (1999). The intermediate appellate court had concerns about the prosecutor's questions but did not reach that issue, saying:

"In spite of all our concerns regarding the propriety of the prosecutor's conduct, *the appellant has based his appeal entirely upon Rule 5–410(a)(4) and its policies,* and Brown's case must be addressed separately. We find no

---

1. Maryland Rule 5–410 provides in pertinent part:

"(a) *Generally.* Except as otherwise provided in this Rule, evidence of the following is not admissible against the defendant who made the plea or was a participant in the plea discussions:

\*　　　\*　　　\*

(4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or nolo contendere or which result in a plea of guilty or nolo contendere which was not accepted or was later withdrawn or vacated."

error with regard to appellant arising out of Rule 5–410(a)(4) or its policies." (Emphasis added)

*Elmer v. State,* 119 Md.App. 205, 219, 704 A.2d 511, 517 (1998). The evidentiary issue in the petition of writ of certiorari also seemed to address only the issue of whether the State's Attorney's cross-examination of Brown violated Md. Rule 5–410. The issue in Elmer's petition for certiorari was framed as follows:

"Whether the Court of Special Appeals erred in affirming the judgments despite the error of the trial court in permitting the prosecutor to cross-examine the co-defendant Robert Brown with statements made by his counsel during plea negotiations, statements *inadmissible against him under Maryland Rule 410(a)(4)* and which directly incriminated Mr. Elmer." (Emphasis added).

This Court, as did the Court of Special Appeals, holds that the State's cross-examination of Brown concerning statements made during his plea bargaining was not inadmissible under Md. Rule 5–410(a)(4) because: "The purpose of [Md. Rule 5–410] would not be furthered by extending its application to include defendants who were not a party to the plea negotiations." 353 Md. at 11, 724 A.2d at 630; *Elmer,* 119 Md.App. at 219, 704 A.2d at 517. Thus, on the only evidentiary issue decided by the Court of Special Appeals, this Court agrees with the intermediate appellate court that there was no violation of Md. Rule 5–410 because the rule's prohibition does not apply to a co-defendant who was not involved in the plea negotiations. Since this Court concurs with the intermediate appellate court on the only evidentiary issue before either appellate court, we should not reach, let alone reverse on, the issue of whether a new trial is necessary because questions asked by the prosecutor, not answers given by the witness, constituted prejudicial error, even if Md. Rule 5–410 was not violated.

## WERE THE PROSECUTOR'S QUESTIONS IMPROPER?

Robert Brown was a co-defendant on trial with David Elmer. He testified as a defense witness. Unquestionably

the prosecutor has a right to cross-examine any defense witness about a prior inconsistent statement when the prosecutor has a good faith belief the prior inconsistent statement was made by the witness. *See* Md. Rule 5–613(a). Why then was the mere question about a prior inconsistent statement so improper that, even though the witness denies making the statement, the mere asking of the question requires a new trial? Brown's counsel acknowledged that he came to the prosecutor and told the prosecutor that his client was willing to plead guilty to reckless endangerment and that he "expect[ed] my client to testify [that Elmer was the shooter]." The trial judge also apparently accepted the prosecutor's representation that defense counsel said that Brown *"wanted to testify* in my prosecution" of Elmer and "his client would testify just exactly the same as I am asking right now." The State's Attorney and the trial judge could conclude that Brown's attorney was authorized to make those representations about how Brown would testify, and because they were intended by Brown to be conveyed to a third party, *i.e.*, the prosecutor, they were no longer privileged. It is well recognized that information a client gives to an attorney to be conveyed to a third person is not privileged. *See* JOHN W. STRONG, MCCORMICK ON EVIDENCE § 91, at 333 (4th ed. 1992) ("Wherever the matters communicated to the attorney are intended by the client to be made public or revealed to third persons, obviously the element of confidentiality is wanting."). The trial judge could quite properly conclude the prosecutor had a good faith belief that Brown's counsel was repeating what he was told by his client and that defense counsel was not offering perjury or merely guessing when he informed the prosecutor that Brown would testify Elmer was the shooter.

It is noteworthy that, in all of the questions where the judge overruled Elmer's objections, the prosecutor's questions were not based on prior inconsistent statements made directly to the prosecutor, but simply were "did you ever make the statement...." When Brown denied making the inconsistent statements, the only evidence before the jury was Brown's denial, and up to that point there was no suggestion by the

prosecutor that any of the inconsistent statements were made or even relayed to him. It was not a matter of the prosecutor's credibility being weighed against the defendant's credibility; Brown was simply asked whether he made any inconsistent statements to anyone and he denied having done so.

The questions that the Court seems to find most offensive were asked after Brown denied making any inconsistent statement. Faced with Brown's denial of ever telling anyone that Elmer was the shooter and reasonably believing Brown sent a messenger, his attorney, to the prosecutor with the message that, in fact, Brown would testify that Elmer was the shooter, the following occurred:

"THE STATE: Mr. Brown, didn't you say that you would testify to just that in the prosecution of Mr. Elmer?

BROWN: No, I did not. That was never said, no. I never said I was going to testify. I am saying that now here. I am right now sitting here finally—finally after a year and six months in jail, free of all this terror and nervousness and pain and everything that me and my family has had to suffer. I'm here now finally getting to tell the truth, and what really happened in this case.

THE STATE: Did you ever communicate to me that you were going to testify, or you'd be willing to testify in the prosecution of Mr. Elmer?

[COUNSEL FOR ELMER]: Objection.

[COUNSEL FOR BROWN]: Objection.

THE COURT: Sustained. It's already been asked and answered."

The first and most important question of this colloquy was not even objected to, perhaps because Brown's defense counsel knew it was accurate and based on his conversations with the State. The follow-up question was objected to, and the objection was sustained because the question was repetitious of the previous question that was asked and answered without objection. These were the only questions that in any way indicated statements were made to the prosecutor and that implicated the prosecutor's credibility. One was not objected to, and the

follow-up repetitious question was objected to and the objection was sustained.

In addition, these questions were based on the fact that Brown's attorney acknowledged to the trial judge that, acting as Brown's agent, he told the State's Attorney that Brown would testify that Elmer was the shooter. It really is difficult to understand what the prosecutor did that justifies reversing Elmer's conviction based solely on these cross-examination questions, even if the issue was properly before this Court. The State's Attorney simply used a leading question to cross-examine a defense witness about a prior inconsistent statement he had reason to believe the witness made to an agent to be conveyed to the State's Attorney. Maryland Rule 5–611(c) permits leading questions and Md. Rule 5–613(a) permits examining a witness about a prior inconsistent statement. Both appellate courts held the question does not violate Md. Rule 5–410 prohibiting questions about statements made during plea discussions. There is no suggestion, let alone any valid claim, that the questions violated the attorney-client privilege because the questions related to Brown's proposed testimony, which Brown apparently intended to be communicated to the State's Attorney via his attorney.

How does the majority justify reversing this conviction? At one point the majority tells us: "As to Elmer, the statement which the prosecutor attempted to elicit from Brown constituted inadmissible hearsay." 353 Md. at 11–12, 724 A.2d at 630. If the majority is really suggesting that impeaching an adverse witness with the witness's own prior inconsistent statements constitutes inadmissible hearsay, this radical departure from Md. Rule 5–613, which covers prior statements by a witness, should be more fully explained. Another reason given by the majority for its reversal apparently involves an appellate fact finding that is simply not justified by the record. The majority says:

> "[T]he prosecutor's questions suggested the existence of facts which he could not prove, and indeed, after the bench conference, he *knew* he could not prove. Following the bench conference where defense counsel articulated the

source of the information, the prosecutor lacked a good faith belief in the factual predicate implied in the question." 353 Md. at 14–15, 724 A.2d at 631 (1999). The trial judge had a hearing at the bench and obviously concluded that the prosecutor had a good faith belief that Brown told his attorney Elmer was the shooter and/or he would testify Elmer was the shooter. There was a dispute about what the defense attorney said, and the trial judge was entitled to accept the State's version, but even accepting only the defense version, the judge could still find a good faith basis for the prosecutor's questions. Defense counsel said to the judge, "I told him what my client would testify to. I never told him my client said that." That clarification at the bench after the colloquy began does not negate the prosecutor's good faith belief that defense counsel's representation about what his client would say under oath was based on what his client told him, even if defense counsel did not expressly so state. If an attorney represents to another member of the bar "this is what my client would testify to," then it could be reasonably assumed that this was not merely a wild guess, but that the attorney was authorized by the client to so state or, at least, that the client led the attorney to believe that would be the client's testimony. It is reasonable to assume that attorneys, unless they have express authorization or a sound basis for doing so, would not make representations about how their clients would testify. Because Brown's attorney expressly stated to the State's Attorney, "this is what my client will testify to," the State's Attorney is entitled to assume that is what the client said and need not assume that the attorney was just making this up or offering to have his client testify any way the State wanted him to.

Let us look at another example of the same issue. A witness's attorney comes to a plaintiff in a civil case and says "my client, John, wants to testify in your case and will testify the defendant's light was red." Months later when the case comes to trial, John is called by the defendant and testifies the defendant's light was green. A trial judge ought to be able to conclude that there is a good faith basis for the plaintiff to

cross-examine John about whether he ever told anyone that the light was red, or told his lawyer that he would testify that the light was red. Posing those questions in cross-examination based on what the plaintiff was told by the witness's attorney should not be deemed to be bad faith and reversible error. These are analogous to the cross-examination questions asked by the State's Attorney in the instant case.

The few cases cited by the majority for their language about a prosecutor's duty are really not relevant. I agree there should be a reversal when the prosecutor acting in bad faith attempts to get inferences not based on evidence before the jury in the question, or where the fact assumed to be true in the prosecutor's question was inadmissible and prejudicial, or perhaps even where the fact improperly assumed to be true in the question was not denied by the witness and thus might be assumed to be true by the jury. None of the cases cited by the majority reversed a conviction where the question was based on a good faith belief that the fact asserted as part of the question was true and where the question sought to elicit an admissible prior inconsistent statement.

## FAILURE TO REQUEST A MISTRIAL

A final troubling aspect of the majority's decision is that the Court finds that the prosecutor's questions were so prejudicial as to require a new trial, but the defense attorney did not think the questions were prejudicial enough to ask for a mistrial. There was no inadmissible evidence in the instant case; at most there were improper questions. When the questions were asked defense counsel merely objected but he did not request a mistrial. After the questions objected to were answered and Brown denied ever making any statement inconsistent with his trial testimony that he, not Elmer, was the shooter, counsel seemed quite willing to let the trial continue. When the final, and perhaps most damaging, question was asked about whether Brown communicated a prior inconsistent statement to the prosecutor, there was not even an objection until the question was again asked, and then defense counsel's objection was sustained and again, although

there was a colloquy at the bench, there was no motion for mistrial or curative instruction. Does the majority really believe the benefits to Elmer from Brown's testimony that he, not Elmer, was the shooter were nullified by the questions concerning Brown's prior inconsistent statement, especially when he denied making the statements? The reason why Elmer's attorney did not make any motion for a mistrial seems obvious; defense counsel did not believe the cross-examination questions, especially when the inconsistent statements were denied, were so prejudicial that the trial should be aborted. Had Elmer's counsel requested and received a mistrial, there was a good chance that at any subsequent trial co-defendant Brown might not be available or willing to assume culpability for the shooting and exonerate Elmer. A new trial, possibly without co-defendant Brown's exculpatory testimony, would not be as advantageous as the present trial with Brown's exculpatory testimony, regardless of any inference that Brown may have made a prior inconsistent statement to the prosecutor. A mistrial may not have been requested by Elmer's attorney because it would not have been advantageous to his client at that time.

When an improper question is asked and there is an objection, the attorney is saying the question should not be answered, and if the judge sustains the objection, there is no reversible error unless the attorney asks for and is denied a mistrial. When the question is not answered or the answer the witness gives is favorable to the objecting party, that ought to be treated the same as the judge sustaining the objection. An objection is, in effect, a statement that the question as phrased should not be answered. It is not a statement that the question is so prejudicial that the trial must immediately be aborted even if the objection is sustained, the witness does not give any response or any damaging response. If a question is objected to and either the question is not answered or the answer is favorable to the objecting party, then the question objected to should be considered moot, and if the attorney makes no further request, then there should be no reversible error. When an

attorney believes the opponent's question is so prejudicial that nothing will cure the prejudice regardless of whether the objection is sustained, the question is not answered, or the answer is favorable, then it should be incumbent on the attorney not to merely object, but to request a mistrial. If there is a mere objection to a question and not a motion for mistrial, the question becomes harmless by the objection being sustained, the witness not answering the question, or the question being answered in a manner clearly favorable to the objecting party. In the absence of a motion for mistrial, merely objecting to a question that evokes no answer or a favorable answer should not justify a new trial.

An attorney must make clear and explicit any request for a mistrial. In this case, after Elmer's counsel's objection had already been sustained, he approached the bench and made another formal objection. When the court responded, "You've already got your objection. What are you bringing it up again for?" Elmer's counsel replied the objection was being made "for the record." At this point, if the attorney really felt so prejudiced that the trial should be aborted, counsel should have requested a mistrial. If the court granted a mistrial in the absence of a clear request, as the majority requires, it might impair prospects for a new trial due to the defendant's double jeopardy rights.

In all of the cases cited by the majority where a prosecutor's question justified a new trial, there were defense requests for mistrial and the reversible error was in not granting the mistrial. *See Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *United States v. Meeker,* 558 F.2d 387 (7th Cir.1977). The majority cites no case, and I have found no cases, where merely objecting to a question that ultimately produces an answer favorable to the objecting party justified a new trial in the absence of a motion for mistrial.

The type of questioning that the majority decides must require a new trial, even in the absence of a harmful answer or a motion for mistrial, occurs not infrequently during cross-examination. Usually, when leading questions that imply the

existence of a fact or statement known to the cross-examiner are denied by the witness, the situation is dealt with by a curative instruction or an instruction routinely given to the jury at the end of the case. For example, 1 MODERN FEDERAL JURY INSTRUCTIONS ¶ 5.01, at 5–12 (1998), instruction 5–3, Questions, provides in pertinent part:

> "Let me emphasize that a lawyer's question is not evidence. At times, a lawyer on cross-examination may have incorporated into a question a statement which assumed certain facts to be true and asked the witness if the statement was true. If the witness denies the truth of a statement, and if there is no evidence in the record proving that the assumed fact is true, then you may not consider the fact to be true simply because it was contained in the lawyer's question."

*See also* 1 FEDERAL JURY PRACTICE AND INSTRUCTIONS, CIVIL AND CRIMINAL § 12.08, at 347 (4th ed. 1992) ("The questions asked by a lawyer for either party to this case are not evidence. If a lawyer asks a question of a witness which contains an assertion of fact, therefore, you may not consider the assertion by the lawyer as any evidence of that fact. Only the answers are evidence."). Had Elmer's attorney requested such an instruction in the instant case and had the judge refused, then there would have been cause for reversal. The obligation should be on counsel who believes a client is prejudiced by a mere cross-examination question, even though it is answered by the witness in a manner favorable to the client, to either request a curative instruction or a mistrial.

## HARMLESS ERROR

A primary issue raised by the State in the Court of Special Appeals and an issue that is always before this Court pursuant to Md. Rule 8–131(b) is harmless error. Since the intermediate appellate court affirmed Elmer's conviction, that court did not decide the harmless error issue. It is difficult to imagine a case better suited to the application of the harmless error doctrine.

The instant case involved a drive-by shooting with racial overtones. Two white males drove into a predominantly African–American housing development and swerved toward a group of African–American youngsters, narrowly missing one of them. The teenagers walked to a nearby basketball court and told two people there what had just occurred. When the same two men driving the same car returned to the area, people threw rocks at the car. The car again swerved toward the crowd and drove into the basketball area.

A short time later the car returned for a third time, and Elmer, the passenger, was brandishing a loaded shotgun. The gun belonged to Elmer, and he had nine additional shotgun shells in his pocket. The shotgun was discharged, wounding an innocent bystander. Based on the evidence and the jury's findings, the issue of who actually pulled the trigger is simply irrelevant. The jury quite properly found both men conspired to commit an assault with intent to disable and both were joint participants in shooting with intent to disable. The evidence more than justified both of these guilty verdicts as to both of these participants. Since Brown and Elmer were joint conspirators and joint participants, it is irrelevant who pulled the trigger. Even if the question posed to Brown erroneously implied a prior inconsistent statement that Elmer was the shooter, that error was harmless beyond any reasonable doubt.

Appellate courts should be very cautious in reversing any judgment where there was no inadmissible evidence presented to the trier of fact. Reversal in the absence of a motion for mistrial should not occur merely because of a cross-examination question that contained an assertion of fact and especially after, as in the instant case, the asserted fact is denied by the witness. I respectfully dissent from the portion of the Court's opinion reversing Elmer's conviction.

Judge RODOWSKY has authorized me to state that he joins in the views expressed in this concurring and dissenting opinion.